[L.A. No. 30400.. In Bank. July 24, 1975.]

WILLIAM BUCKALOO, Plaintiff and Appellant, v.
CECIL M. JOHNSON et al., Defendants and Respondents.

**COUNSEL**

Arata, Misuraca & Clement and James L. Beyers for Plaintiff and Appellant.

Herbert Manasse for Defendants and Respondents.

**OPINION**

**MOSK, J.**—A real estate broker denied his commission alleged to be due and owing on the sale of certain real property brought this action against defendants, the vendor and vendee of the property and members of the vendee group. Plaintiff's principal allegation is that the acts of defendants constituted the tort of intentional interference with prospective economic advantage. Defendants' demurrer to the complaint was sustained, and after plaintiff declined to amend the action was dismissed. (Code Civ. Proc., § 581, subd. 3.) We reverse in part and affirm in part.

The facts alleged in the complaint are as follows: Plaintiff Buckaloo is a licensed real estate broker doing business in Little River, California. Defendant Mildred Benioff was the owner of certain undeveloped beach property in Mendocino County, known as Dark Gulch. In 1967 and 1968 plaintiff had an exclusive right to sell the Dark Gulch parcel. No sale was consummated during this period and the exclusive listing expired in 1968.

In 1972, Benioff erected a sign on the property which read: "For Sale—Contact Your Local Broker." The complaint alleged that Benioff intended her sign to constitute an "open listing" with brokers local to the Mendocino coast, who would then negotiate with prospective buyers towards sale of the property on terms satisfactory to the vendor.[1]

On May 3, 1972, plaintiff was approached at his place of business by defendants Virginia Arness, her daughter, and Cecil Johnson, the latter a real estate salesman in the employ of defendant Ferne Goodwin. The potential buyers indicated an interest in coastal investment property and a general discussion followed. Johnson then asked plaintiff if he "cooperated with other brokers" and Buckaloo replied that he did. Arness then inquired about that "property with the sign" and the conversation specifically revolved about Dark Gulch.

Plaintiff was well aware of the merits of the property from his prior association with Benioff and was able to inform the Arness group of its assets and liabilities. Plaintiff advised that the asking price was high for investment purposes but the parcel might be attractive to an owner-user. The conversation then progressed to a discussion of other properties but eventually returned to the Dark Gulch parcel when Arness showed continuing interest. At the end of the day plaintiff found accommodations for the group and they left, promising to return the next day.

■ ■■■ The group never returned. Plaintiff sent Benioff a note informing her that he was the "procuring cause" of the Arness group and asking her to refer them to him should the group contact Benioff directly.[2] Some weeks later plaintiff learned that a sale had been

---

[1] Authorities describe an "open listing" as follows: "Under the terms of an open listing agreement the seller agrees to pay a commission to the broker only if that broker procures a buyer who is ready, willing, and able to purchase the property on the terms of the listing agreement or on other terms acceptable to the seller. Through the use of an open listing the seller can employ a number of brokers each of whom has an equal opportunity to earn a commission. . . . [I]f the seller makes a direct sale to a buyer whom he has *independently procured,* all open listings are terminated and he need not pay a commission to any of the listing brokers." (Italics added and deleted; fn. omitted.) (1 Miller & Starr, Current Law of Cal. Real Estate (1965) pp. 212-213.) Other types of standard listing agreements are the exclusive agency agreement and the exclusive right to sell agreement. (See *Tetrick* v. *Sloan* (1959) 170 Cal.App.2d 540, 546-547 [339 P.2d 613].)

[2] "A broker is the 'procuring cause' of a real estate transaction if he finds a purchaser who is ready, willing, and able to buy the property on the terms stated and he obtains a valid contract obligating the purchaser on these terms. If the broker cannot secure a written offer from the purchaser, he is still considered as the 'procuring cause' if he brings the principal and the purchaser together so that they may enter into such a contract. In other words, if the broker's efforts result in a 'meeting of the minds' between

made to the Arness group without his participation. He contacted Benioff requesting a commission but was informed by her attorney that he would not share in any commissions paid.

Plaintiff sued Arness (buyer), Benioff (seller), Johnson· (salesman), Goodwin (Johnson's superior), and six unnamed defendants as members of the Arness group. The complaint requested declaratory relief, damages for breach of an implied contract and intentional interference with prospective advantage, and an injunction against the escrow holder. All defendants except Benioff demurred, and their demurrer was sustained; as noted, when plaintiff failed to amend the complaint the action was dismissed as to those defendants. ■■ ■■■■ The action against Benioff is pending.[3]

■■ Any action against either the vendor or the vendee group based on contract or implied contract must fail for want of compliance with the statute of frauds. Civil Code section 1624, subdivision 5, requires a writing subscribed by the party to be charged for "An agreement authorizing or employing an agent, broker, or any other person to purchase or sell real estate, . . . or to procure, introduce, or find a purchaser or seller of real estate . . . for compensation or a commission."

Here it is certain from the face of the complaint that there was no writing authorizing plaintiff to negotiate the purchase or sale of Dark Gulch. Even accepting that the Benioff sign constituted an open listing to

---

the buyer and the seller but the final negotiations and the conclusion of the sale are conducted by them without the aid of the broker, he will still earn his commission." (Fns. omitted.) (1 Miller & Starr, Current Law of Cal. Real Estate (1965) pp. 229-230.) "Whether the broker was the 'procuring cause' and the 'motivating force' of the sale is a question of fact to be determined from all of the circumstances surrounding each specific case." (Fn. omitted; *id.*, at p. 229.)

[3]Ordinarily the rule of one final judgment precludes piecemeal disposition and immediate appellate consideration of rulings prior to the final adjudication of the entire case. (See 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 36, pp. 4050-4051.) However, an exception to the rule is recognized when there are multiple parties and a judgment is entered as to one party leaving no issues to be determined involving the latter. (*Id.*, at § 48, pp. 4062-4064.) As said in *Wilson* v. *Sharp* (1954) 42 Cal.2d 675, 677 [268 P.2d 1062]: "The order granting the motion to strike operated to remove from the case the only cause of action alleged against the county counsel and to leave no issues to be determined between him and plaintiff, and it was appealable as a 'final judgment' within the meaning of section 963 of the Code of Civil Procedure." Because the sustaining of the demurrer herein left no issues to be decided between plaintiff and the demurring defendants, the dismissal entered upon the sustaining of the demurrer was appealable notwithstanding that the matter is still pending as to defendant Benioff.

area brokers, it is clear that this alone would not suffice to satisfy the statute if for no other reason than that there was no subscription by the purported principal. In short, while there are many types of informal documents and memoranda which will satisfy the requirements of the statute of frauds (see generally, 1 Miller & Starr, Current Law of Cal. Real Estate (1965) pp. 223-225; *Seck* v. *Foulks* (1972) 25 Cal.App.3d 556 [102 Cal.Rptr. 170]), no case has held that a sign such as here posted would so qualify. Accordingly, plaintiff does not contend there was compliance with the statute.

■   However, plaintiff included in his complaint a cause of action not dependent on compliance with the statute of frauds: intentional interference with prospective economic advantage. This is a tort theory of recovery rather than contract, and is based on interference with a "relationship" between parties irrespective of the enforceability of the underlying agreement.[4] As stated in the leading California case of *Zimmerman* v. *Bank of America* (1961) 191 Cal.App.2d 55, 57 [12 Cal.Rptr. 319]: "The tort of interference with an advantageous relationship, or with a contract, does not, however, disintegrate because it relates to a contract not written *or an advantageous relation not articulated into a contract.* The nature of the tort does not vary with the legal strength, or enforceability, of the relation disrupted. The actionable wrong lies in the inducement to break the contract or to sever the relationship, not in the kind of contract or relationship so disrupted, whether it is written or oral, enforceable or not enforceable." (Italics added.)

This tort, although infrequently invoked, is not new to the law. Interference with contractual relations was recognized as an actionable wrong over a century ago in the celebrated English case of *Lumley* v. *Gye* (Q. B. 1853) 118 Eng.Rep. 749. With respect to the related tort of interference with prospective advantage, Prosser teaches that "The real source of the modern law . . . may be said to be the case of Temperton v. Russell [1893], in which the Court of Queen's Bench declared that the principles of liability for interference with contract extended beyond existing contractual relations, and that a similar action would lie for interference with relations which are merely prospective or potential." (Fn. omitted.) (Prosser, Torts (4th ed. 1971) p. 949.)[5]

---

[4] It may well be surmised that the trial court sustained the demurrer solely on the basis of the statute of frauds defense, because defendants' points and authorities in support of the demurrer spoke only of the statute of frauds and did not address the question of tort theories of recovery not dependent on the statute.

[5] Some authorities date the origin of the tort to "the penalty provided in the Ordinance of Labourers, (23 Edw. III (1349), st. 1) for receiving and retaining any laborer who had

■ The great weight of authority is that the tort of interference with contract is merely a species of the broader tort of interference with prospective economic advantage. (1 Harper & James, Torts (1956) pp. 510-514; 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 386, pp. 2638-2639; Prosser, Torts (4th ed. 1971) p. 929; Note, *Developments in the Law—Competitive Torts* (1964) 77 Harv.L.Rev. 888, 961-962; Bernhardt, Cal. Real Estate Transactions Supp. (Cont.Ed.Bar 1974) § 5.81.) Thus while the elements of the two actions are similar, the existence of a legally binding agreement is not a *sine qua non* to the maintenance of a suit based on the more inclusive wrong.[6]

California courts have on numerous occasions applied these principles in the context of real estate transactions. In *Zimmerman,* the plaintiff broker entered into an oral agreement with the defendant vendors whereby the broker would procure a purchaser for the defendant's real property. The broker obtained a buyer willing to exchange properties and both parties to the exchange orally agreed to pay the broker a commission. The plaintiff alleged that thereafter employees of defendant bank maliciously induced the parties to breach this oral agreement.

The Court of Appeal began by exploring the "two conflicting doctrines" at work: "One doctrine requires certain kinds of contracts to be in writing and finds expression in the statute of frauds. The other doctrine holds that a party who suffers the loss of an advantageous relationship or of a contract should recover his damages from a malicious interloper. Can one so damaged through the loss of an oral contract prevail despite noncompliance with the statute of frauds?" (191 Cal.App.2d at p. 57.) The court concluded that the complaint stated a

---

run away from his employer. Concomitant with the ordinance and the ensuing statute there developed a statutory action for enticing or harboring a servant of another, but such action did not depend upon a binding agreement for service between the master and the laborer. (Sayre, *Inducing Breach of Contract* (1923), 36 Harv.L.Rev., pp. 663, 666.)" (*Zimmerman,* at p. 58 of 191 Cal.App.2d.)

[6]As said in the case of *Builders Corporation of America v. United States* (N.D.Cal. 1957) 148 F.Supp. 482, 484, footnote 1: "Both the tort of interference with contract relations and the tort of interference with prospective contract or business relations involve basically the same conduct on the part of the tortfeasor. In one case the interference takes place when a contract is already in existence, in the other, when a contract would, with certainty, have been consummated but for the conduct of the tortfeasor. . . . Rather than characterizing the two as separate torts, the more rational approach seems to be that the basic tort of interference with economic relations can be established by showing, *inter alia,* an interference with an existing contract or a contract which is certain to be consummated, with broader grounds for justification of the interference where the latter situation is presented."

cause of action notwithstanding the lack of a valid contract, because the essence of the tort "contemplates, basically, the disruption of a relationship, not necessarily the breach of a contract." *(Ibid.)*

Since *Zimmerman* was decided California courts have continued to apply this rationale in brokerage situations. In *Golden* v. *Anderson* (1967) 256 Cal.App.2d 714 [64 Cal.Rptr. 404], the plaintiff broker received an oral, open listing from the vendor. The broker then embarked on an extensive series of negotiations with a potential buyer, a cemetery operator. However, in an effort to deprive the broker of his commission, the cemetery had a third party purchase the property directly from the vendor and later retransfer it to the cemetery. When the vendor learned the identity of the true principal, he notified the broker, who brought an action for intentional interference with the "brokerage agreement." The court held that a cause of action existed against all individual defendants who knew of the oral agreement, because " '[C]ontracts which are voidable by reason of the statute of frauds, formal defects, lack of consideration, lack of mutuality, or even uncertainty of terms, still afford a basis for a tort action when the defendant interferes with their performance.' " *(Id.,* at p. 719, quoting Prosser, Torts (2d ed. 1955) p. 726.)

In *Friedman* v. *Jackson* (1968) 266 Cal.App.2d 517 [72 Cal.Rptr. 129], the complaint alleged that the plaintiff broker entered into an oral agreement with the vendor to find a purchaser at a commission of 5 percent of the selling price. The broker showed the property to the defendant buyers, who "falsely and fraudulently" informed the broker that the price was too high. Thereafter the buyers went directly to the vendor, informed her they had learned of the property through a "friend," and negotiated a sale price which did not include the broker's commission. The court recognized there was authority for the view that an owner of real property may intentionally breach an oral brokerage agreement, and even conspire with the buyer to do so, and yet be safe from liability because of the statute of frauds. (*Colburn* v. *Sessin* (1949) 94 Cal.App.2d 4, 6 [209 P.2d 989]; *Sweeley* v. *Gordon* (1941) 47 Cal.App.2d 381, 387 [118 P.2d 14].) The court found it unnecessary to examine the continuing vitality of these earlier decisions because "Whatever may be the rights and liabilities of a purchaser who encourages or 'conspires' with a seller in the latter's knowing decision to avoid his obligation to a broker, a purchaser may not, by fraudulent means, cause a seller unwittingly to so change his position that thereafter he cannot reasonably be required to fulfill his oral commitment to his

agent." (*Friedman,* at p. 520 of 266 Cal.App.2d.) Accordingly, relying on *Zimmerman* and *Golden,* the court held that a cause of action was stated against the defendant buyers notwithstanding the unenforceability of the agreement between the plaintiff and the vendor.

*Keely* v. *Price* (1972) 27 Cal.App.3d 209 [103 Cal.Rptr. 531], also involved an oral brokerage agreement between broker and vendor. Subsequently the prospective buyer orally agreed to release the seller from the obligation of the commission and to undertake that responsibility himself. When the sale was consummated and neither party paid the commission the broker sued the buyer's representative. The court held, quoting *Zimmerman,* that if the plaintiff were able to amend his complaint to allege that the defendant induced the buyers to fail to pay the commission, a cause of action for intentional interference would be adequately stated. "The fact that the obligation of either the seller or the buyers to pay the commission was an unenforceable obligation under the statute of frauds does not defeat plaintiff's third cause of action of interference with advantageous economic relationships." (*Id.,* at p. 216; see also *Allen* v. *Powell* (1967) 248 Cal.App.2d 502, 504-509 [56 Cal.Rptr. 715, 29 A.L.R.3d 1218].)

The high courts of two sister states have recently had occasion to examine the parameters of the tort of intentional interference with prospective advantage in the context of a brokerage relationship, and have reached results similar to those of our Courts of Appeal.

In *Glenn* v. *Point Park College* (1971) 441 Pa. 474 [272 A.2d 895], the Supreme Court of Pennsylvania for the first time considered whether the tort of interference with contract could exist although the contract was merely prospective. The vendor in *Glenn,* as in the instant case, had no exclusive listing with the plaintiff broker but stated it would "entertain offers through brokers, and would pay the customary commission." The plaintiff conducted a protracted series of negotiations with the defendant purchaser, who then utilized the information supplied by the broker to complete a direct sale with the vendor without the plaintiff's participation.

The Pennsylvania court began by noting: "We see no reason whatever why an intentional interference with a prospective business relationship which results in economic loss is not as actionable as where the relation is presently existing, although we recognize that there well may be more difficult problems of proof in the latter situation." (Fn. omitted; *id.,* at

p. 897.) In order for the complaint to have stated a cause of action, however, the following elements would have to have been pleaded: "(1) a prospective contractual relation between [the vendor] and plaintiffs, (2) the purpose or intent to harm plaintiff by preventing the relationship from occurring, (3) the absence of privilege or justification on the part of the actor [purchaser] and (4) the occurrence of actual harm or damage to plaintiff as a result of the actor's conduct." (*Id.,* at p. 898.) The court concluded that the complaint as then drafted failed to negate the presence of privilege, which would exist if "the defendant [purchaser] merely failed to be persuaded by the [brokers] to deal through them . . . and chose instead to deal directly with [the vendor]." (*Id.,* at p. 900.) The court then remanded the matter so that plaintiffs could make the necessary amendment.

In *McCann v. Biss* (1974) 65 N.J. 301 [322 A.2d 161], the Supreme Court of New Jersey held that a real estate broker who is barred from recovering a commission by reason of the statute of frauds may not achieve the same result indirectly by a suit in tort for intentional interference with prospective advantage. However, the court was careful to emphasize that "this is not a case like . . . Harris v. Perl . . . 197 A.2d 359 (1964), where the buyers were found guilty of tortious conduct toward a broker resulting in the pecuniary advantage to them of reduction in the price corresponding to the amount of the commission." (*Id.,* at p. 167, fn. 4.)

*Harris* is an oft-cited case which encapsulates many of the policy arguments advanced by plaintiffs herein. There the plaintiff broker was permitted to recover from the defendant purchaser when the defendant went directly to the owner and completed a sale which did not include the broker's commission. "[O]ne who unjustifiably interferes with the contract of another is guilty of a wrong. And since men usually honor their promises no matter what flaws a lawyer can find, the offender should not be heard to say the contract he meddled with could not have been enforced. . . . [¶] Protection is not limited to contracts already made. The law protects also a man's interest in reasonable expectation of economic advantage. Harper and James, Torts § 6.11, p. 510 (1956)." (*Harris,* at p. 363 of 197 A.2d.)

The foregoing authorities, while not presenting a precise or wholly consistent picture of the parameters of the tort of intentional interference with prospective advantage, nevertheless disclose some fundamental principles. First of all, the tort is considerably more

inclusive than actions based on contract or interference with contract, and thus is not dependent on the existence of a valid contract. But this broad assertion must be qualified by the statement that the wrong complained of cannot be merely a failure on the part of the actor to comply with an unenforceable contract. The statute of frauds conclusively establishes that brokerage contracts with either the vendor or the vendee must be in writing. We have neither the authority nor the inclination to circumvent that declared policy by permitting tort actions to become an expedient substitute for contract actions specifically forbidden by statute.

Secondly, as the *Zimmerman* line of cases teaches, the mere fact that a prospective economic relationship has not attained the dignity of a legally enforceable agreement does not permit third parties to interfere with performance. This of course does no violence to traditional contract principles because the third party, a stranger to the economic relationship, was not the party whom the contract principle was designed to affect. Thus the cases are clear that a prospective purchaser may not induce a seller bound under an oral agreement to breach that agreement and sell to him at a price which necessarily excludes the broker. Where fraud is involved, as in *Golden,* the actionable wrong stands out in bold relief. Less obvious perhaps, but nonetheless actionable, are the circumstances in which the purchaser, with full knowledge of the economic relationship between broker and seller, intentionally induces the latter to violate the terms of the relationship and seek refuge in the unenforceability of the contract. As the New Jersey court noted, however, in order to successfully maintain this cause of action it must be shown that the interloper received pecuniary benefit in the way of a reduced selling price resulting from the exclusion of the broker's commission. (*McCann v. Biss* (1974) *supra,* 322 A.2d 161, 164.)

Thirdly, we note the elements of the tort itself. In the real estate brokerage context these are: (1) an economic relationship between broker and vendor or broker and vendee containing the probability of future economic benefit to the broker, (2) knowledge by the defendant of the existence of the relationship, (3) intentional acts on the part of the defendant designed to disrupt the relationship, (4) actual disruption of the relationship, (5) damages to the plaintiff proximately caused by the acts of the defendant.

In California, unlike Pennsylvania (*Glenn v. Point Park College* (1971) *supra,* 272 A.2d 895, 899-900), privilege or justification is an affirmative

defense, and the lack thereof need not be shown by the original pleader. (4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 387, p. 2639.) Perhaps the most significant privilege or justification for interference with a prospective business advantage is free competition. Ours is a competitive economy in which business entities vie for economic advantage. In a sense, all vendees are potential buyers of the products and services of all sellers in a given line, and success goes to him who is able to induce potential customers not to deal with a competitor. Thus as Prosser states: "So long as the plaintiff's contractual relations are merely contemplated or potential, it is considered to be in the interest of the public that any competitor should be free to divert them to himself by all fair and reasonable means." (Prosser, Torts (4th ed. 1971) p. 954.)

But entirely different considerations prevail where the buyer, after taking advantage of the broker's efforts and stock in trade, induces the seller to accept the "low net price" through the expedient of excluding the broker's commission. There is no public policy to be served by encouraging such devious dealings; on the contrary, such an intrusion into a protected economic relationship is precisely the conduct condemned by the traditional tort of interference with contract. As has been amply demonstrated, the mere fact that the relationship has not yet ripened into a contract is of no moment when the cause of action is based on the actor's subversion of a prospective contractual relationship.

■ Turning now to the facts alleged in plaintiff's complaint, we observe preliminarily that in reviewing a judgment of dismissal entered upon the sustaining of a demurrer we accept as true all allegations stated in the complaint. (*State of California* v. *Superior Court* (1974) 12 Cal.3d 237, 252 [115 Cal.Rptr. 497, 524 P.2d 1281].) Thus even if we were to entertain doubts that plaintiff could factually support his allegations at trial we are nevertheless obliged to give them deference for purposes of this review.

Thus while it can be urged that the sign alone does not rise to the level of an implied contract, plaintiff alleges in addition thereto (1) that Benioff *intended* her sign to constitute an open listing with all area brokers, (2) that Benioff *intended* that brokers induced by the sign to cooperate with buyers would be paid a commission for procuring a buyer on terms Benioff would accept, and (3) that plaintiff understood this to constitute an invitation to himself and other area brokers to attempt to find a buyer for the Benioff property. These facts, plus any evidence that may establish the real estate custom and practice in the community, establish a colorable economic relationship between Benioff and plaintiff

with the potential to develop into a full contractual relationship. "Basically, a brokerage listing is an offer of a unilateral contract, the act requested being the procuring by the broker of a purchaser ready, able and willing to buy upon the terms stated in the offer." (*Baumgartner* v. *Meek* (1954) 126 Cal.App.2d 505, 508 [272 P.2d 552].)

Plaintiff claims that he in fact provided the necessary buyer and thus completed the unilateral, albeit unenforceable, contract with Benioff. His note to Benioff characterizing himself as the "procuring cause," as well as the allegation that "Without Buckaloo's services, the sale between the Arness group and Mrs. Benioff would not have been made," adequately provide this element of the tort. It may well be that plaintiff was not the actual procuring cause, and that no colorable relationship with Benioff existed. But as stated in *Sessions* v. *Pacific Improvement Co.* (1922) 57 Cal.App. 1, 18 [206 P. 653], "Whether or not the sale is primarily the result of the broker's efforts is a question of fact." As a factual matter it is, of course, not amenable to disposition on demurrer.

The complaint adequately pleads the Arness group's knowledge of the special relationship between plaintiff and Benioff. Paragraph 14(f) states: "The Arness group, Goodwin and the Doe defendants *knew* that Mrs. Benioff's sign constituted a promise to pay a commission to any local broker with whom a buyer consulted and who, through efforts to expose the Devil's Gulch [*sic*] property and explain its various features and the properties comparable to it, procured the Arness group as a buyer . . . . *With that knowledge,* the Arness group went directly to Mrs. Benioff and *induced her* to make an agreement with them for the sale of her property *that left Buckaloo totally uncompensated.*" (Italics added.)

Paragraph 22 of the complaint adequately pleads the intent element: "The Arness group . . . intentionally interfered with the prospective commission to be paid to Buckaloo by approaching Mrs. Benioff directly and inducing her to make an agreement with them for sale of her property that intentionally excluded any participation by Buckaloo by commission." Paragraph 22 also inferentially pleads that the sales price was the low net figure arrived at by computing the price without reference to Buckaloo's commission. The allegations of proximate cause and damages are set out at numerous places in the complaint and need not be detailed here.

We therefore conclude that viewing the allegations in the complaint in a manner most favorable to the pleader, a cause of action of intentional

interference with prospective advantage was stated against the demurring parties.[7] Whether plaintiff will ultimately establish the elements of the tort is a factual matter and as such properly in the domain of the trier of fact.

The judgment on the third cause of action as to defendants Johnson, Goodwin, Arness, Jane Doe Arness, and Doe One through Five is reversed. The judgment on all remaining counts as to the demurring defendants is affirmed.

Wright, C. J., McComb, J., Tobriner, J., Sullivan, J., Clark, J., and Richardson, J., concurred.

---

[7]Defendants' principal contention here is that "there can be no interference with a contract unless the contract, written or oral, actually exists, and a contract can not be implied unless facts are pleaded which give rise to the implication." Even at this late date defendants fail to comprehend that plaintiff is not alleging interference with contract but interference with prospective advantage. The protected area of activity is not a contractual relationship but an economic relationship with the potential to ripen into contract. Whether the relationship is of sufficient depth to support the tort is a factual question which plaintiff will be put to the burden of proving at trial.