[No. A010517. First Dist., Div. Two. Aug. 24, 1984.]

MANOR INVESTMENT CO., INC., et al., Plaintiffs and Appellants, v. F. W. WOOLWORTH CO., et al., Defendants and Appellants.

[Opinion certified for partial publication.*]

*See footnote 1, post, page 588.

**COUNSEL**

Wayne A. McFadden for Plaintiffs and Appellants.

William C. Bigarani, in pro. per., Michal J. Brady, Mark G. Bonino, Dorothy McArthur Landro, Ropers, Majeski, Kohn, Bentley, Wagner ,& Kane and Ropers, Majeski, Kohn, Bentley & Wagner for Defendants and Appellants.

**OPINION**

**KLINE, P. J.**—Manor Investment Co., Inc., Lynn Conley and Paul Conley (hereinafter referred to collectively as appellants) appeal from an order granting a new trial after a jury awarded them $140,000 compensatory and $60,000 punitive damages on their cause of action for "conspiracy to interfere with business relationship."[1] F. W. Woolworth Co. (Woolworth) and

---

[1]Pursuant to California Rules of Court, rules 976 (b) and 976.1, this opinion is certified for publication, except for a portion of the facts and part III.

William LeFevre (LeFevre) (hereinafter referred to collectively as respondents) cross-appeal from: 1) the judgments entered against them, and 2) an order denying their motion for judgment notwithstanding the verdict. We modify the order granting a new trial, and as so modified, affirm the orders appealed from.

FACTS

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .*

Appellants Paul Conley and Lynn Conley (hereinafter referred to collectively as the Conleys) are brothers who are the sole shareholders of Manor Investment Co., Inc. (Manor). Manor is in the business of operating "storefront" check cashing facilities.

In July of 1970, the Conleys (who were then doing business as Handy Check Cashers Company) entered into a license agreement with Woolworth for the purpose of operating a check cashing facility at the Woolworth store located on Market Street in San Francisco. A second substantially similar license agreement was executed by the Conleys and Woolworth in July of 1973. The second agreement provided for a sizable increase in the rent payable to Woolworth. In both agreements the rent to be paid Woolworth was by a flat monthly rent plus a fixed percentage of the monthly receipts from the check cashing facility.

R. W. Nugent was the manager of the Market Street Woolworth store at the time the Conleys entered into the original lease agreement in 1970 and the new agreement in 1973. Respondent LeFevre became manager of the Market Street store in February of 1975.

The instant controversy arises out of Woolworths' termination of the 1973 license agreement in the latter part of 1976. Woolworth purported to terminate the license under article 3 of that agreement which provides: "The original term of the license hereby granted shall commence July 1, 1973 and shall expire on the last day of December, 1973 but the licensed term shall be automatically extended from year to year thereafter; provided, however, that either party may terminate the licensed term on any date by giving to the other party, not less than sixty (60) days before such date of termination, notice of its election to do so." An identical provision (except for dates) was contained in article 3 of the 1970 agreement.

In the year before the agreement was terminated the following events took place: In September of 1975 plaintiffs opened a second check cashing facil-

---

*See footnote 1, *ante,* page 588.

ity near the Woolworth store at 86 Ellis Street. Paul Conley testified that the new facility was opened with Mr. LeFevre's "permission." LeFevre testified that in response to the Conleys' request for permission, he advised them that he had no control over their business activities outside the store provided such activities did not interfere with the business at the Woolworth check cashing facility. Shortly after the Ellis Street facility opened the patronage of the Woolworth facility declined. The rent paid to Woolworth for the check cashing facility also began to decline, as the gross receipts of that facility declined. The monthly rent paid to Woolworth decreased from $1980 in August of 1975 to $949 in April of 1976.

LeFevre testified he had a conversation with the Conleys in March of 1976, in which he informed them of his "extreme dissatisfaction" with the decline in rent paid for the check cashing booth. The Conleys, on the other hand, maintained that in March LeFevre informed them that he was not dissatisfied with the income being derived from the check cashing booth.

In April of 1976, defendant William Bigarani (Bigarani) approached LeFevre about taking over the Woolworth check cashing booth. LeFevre told Bigarani to submit a proposal, which he did through a letter sent by his attorney on April 6, 1976. On July 16, 1976, Bigarani and Woolworth executed a license for the Woolworth check cashing business to commence October 1, 1976.

On July 28, 1976, Woolworth informed the Conleys by letter of its intent to terminate the license agreement as of September 30, 1976, pursuant to the 60-day termination provision in article 3 of the license agreement.

Following the termination of the agreement, appellants filed a complaint alleging 10 causes of action against Woolworth, LeFevre, and Bigarani. At trial, seven of the original causes of action were either nonsuited or dismissed on appellants' own motion, and the case went to the jury on three causes of action only: 1) breach of contract against Woolworth only; 2) "interference with business relationship" against Bigarani only; and 3) "conspiracy to interfere with business relationship" against Woolworth, Bigarani, and LeFevre. The jury returned verdicts in favor of the defendants on the causes of action for breach of contract and interference against defendant Bigarani only. However, the jury found in favor of appellants on the cause of action for "*conspiracy* to interfere with business relations," and awarded appellants $200,000 in compensatory and punitive damages.

Subsequently, respondents filed a motion for judgment notwithstanding the verdict and for new trial. The trial court denied the motion for judgment notwithstanding the verdict, but granted the motion for new trial as to the

cause of action for conspiracy to interfere with business relationship on the grounds that the damages awarded ($200,000) were grossly excessive.

On appeal, appellants' primary contention is that the judge abused his discretion in ordering a new trial on the grounds that the damages awarded were grossly excessive.

. . . . . . . . . . . . . . . . . . . . . . . . . . *

In their cross-appeal, respondents argue that they are entitled to have judgment entered in their favor because the jury verdict vindicating Bigarani on the cause of action for interference with business relationship against him only is inconsistent with the jury verdict finding all defendants liable for conspiracy to interfere with a business relationship. We conclude that the jury verdicts are inconsistent, and that both causes of action for interference with business relationship must be retried.

DISCUSSION

I.

We deal first with the issue raised in respondents' cross-appeal, because it is dispositive of the primary issue raised by appellants.

As earlier described, the jury returned three separate verdicts. The jury found in favor of Woolworth and against appellants on the cause of action for breach of contract. The jury found in favor of Bigarani and against appellants on the cause of action against Bigarani *only* for "interference with business relationship." Finally, on the cause of action for "*conspiracy* to interfere with business relationship" the jury found in favor of appellants and against all three respondents (Woolworth, LeFevre and Bigarani). After the verdicts were rendered, respondents filed a motion for judgment notwithstanding the verdict and a motion for new trial. Although the trial judge granted respondents' motion for a new trial on the grounds that the damages were excessive as a matter of law, he denied their motion for judgment notwithstanding the verdict. In their motion for judgment notwithstanding the verdict, respondents argued that the defense verdicts on the causes of action for breach of contract and interference (as to Bigarani only) compelled a defense verdict on the final cause of action for *conspiracy* to interfere with a business relationship.[2]

In rejecting this argument the trial court wrote:

---

*See footnote 1, *ante,* page 588.

[2]The respondents made an identical argument in support of their motion for new trial.

"As to the cause of action for *conspiracy* to interfere with a business relationship, the Court does have some problems.

"Mr. Bigarani had contacted an employee of Manor before the license was terminated and asked her if she had access to Manor's books and asked her to look at the books and advise if Manor was holding out funds and also if a certain sum was too much to pay and further asked her to come to work for him at an increased salary if he took the business over. She reported this to her employer Manor at once.

"The Court has trouble with the concept that since the jury found that there was *no interference with a business relationship,* there could be a verdict for Plaintiff on the cause of action for conspiracy to interfere with a business relationship.

"The Court does see how logically this premise could be sustained, but it *also* appears somewhat illogical.

"Obviously, a person cannot be liable for, or interfere with his own business relationship, but can he *conspire* with another for the other person to interfere with the business relationship between him and a third person? This is a different problem.

"After a careful reading of what appear to be the leading cases, the Court concludes that it appears from said cases that a person can be liable for conspiring to interfere with a business relationship such as in the case before the Court."

■ We disagree with the above analysis and find that, under the circumstances of this case, the defense verdicts *are* inconsistent with the plaintiffs' verdict on the cause of action for "*conspiracy* to interfere with a business relationship."

Before addressing the substantive issue, we note that there is considerable semantic confusion in this case and the case law generally with respect to torts involving an interference by a third party with a specific economic relationship. The terms "interference with contractual relations," "inducing breach of contract," and (in this case) "interference with business relationships" are often used interchangeably and without adequate definition. (See, e.g., (*Wise* v. *Southern Pacific Co.* (1963) 223 Cal.App.2d 50, 65 [35 Cal.Rptr. 652]; *Dryden* v. *Tri-Valley Growers* (1977) 65 Cal.App.3d 990, 998-999 [135 Cal.Rptr. 720]; *Owens* v. *Foundation for Ocean Research* (1980) 107 Cal.App.3d 179, 185 [165 Cal.Rptr. 571].) In our view, it is

most accurate to describe the tort alleged in this case as an "interference with contractual relations."[3]

The parties in this case have been careless in distinguishing between the various economic torts. They have, at various times, referred to what appears to be the same cause of action as "interference with contractual relations" and "interference with a business relationship." The term "interference with a business relationship" has *apparently* been used in this case to refer to what is more appropriately known as "interference with prospective economic advantage."[4] (*Buckaloo* v. *Johnson* (1975) 14 Cal.3d 815, 822-823 [122 Cal.Rptr. 745, 537 P.2d 865]; *Lowell* v. *Mother's Cake & Cookie Co.* (1978) 79 Cal.App.3d 13, 17 [144 Cal.Rptr. 664, 6 A.L.R.4th 184].) In drawing a distinction between interference with prospective economic advantage and interference with contractual relations the Supreme Court in *Buckaloo* stated: "The great weight of authority is that the tort of interference with contract is merely a species of the broader tort of interference with prospective economic advantage. [Citations.] Thus while the elements of the two actions are similar, the existence of a legally binding agreement is not a *sine qua non* to the maintenance of a suit based on the more inclusive wrong." (*Buckaloo, supra,* 14 Cal.3d at p. 823, fn. omitted.) The *Buckaloo* court also cited with approval the following language from *Builders Corporation of America* v. *United States* (N.D.Cal.

---

[3]Interference with contractual relations and inducing breach of contract should be viewed as separate and distinct torts. Interference is broader in that it compensates for damages resulting from interference with a contractual relationship even though there is no breach. (Note, *Civil Conspiracy and Interference with Contractual Relations* (1975) 8 Loyola L.A. L.Rev. 302, 314 fn. 45; Comment, *Interference with Contractual Relations: A Property Limitation* (1966) 18 Stan.L.Rev. 1406.) Indeed, there could be no finding of inducing breach of contract in this case since the jury found that the license agreement was not breached.

[4]We emphasize the word "apparently" because, due to the carelessness of the pleadings and instructions in this case it is extremely difficult to discern precisely what the parties and the trial court intended by the use of the term "interference with business relationship." We believe they in fact meant "interference with prospective economic advantage" since the two cases cited to support the instruction on this cause of action *both* deal with that tort. (*Buckaloo* v. *Johnson, supra,* 14 Cal.3d at p. 822; *Lowell, supra,* 79 Cal.App.3d at p. 17.) In *Lowell, supra,* the court made oblique reference to the fact that "the basic principles underlying the tort of inducing breach of contract have been extended to impose liability *for intentional interference with business relations* or advantages which are merely prospective and not subject to an existing legally binding agreement." (79 Cal.App.3d at p. 17, italics added.) It is seemingly this language which led the parties to describe the cause of action in the jury verdict forms as one for "interference with business relationship."

Initially, the cause of action against Mr. Bigarani was described in the complaint as "intentional interference with contractual relations." In the jury instructions, this (again, apparently) same cause of action was described as "interference with contract," "interference with business contract," and finally, in the jury verdict forms as "interference with business relationship." Given the confused state of the record, we can do no more than assume that the plaintiffs meant to plead and prove *both* interference with prospective economic advantage and interference with contractual relations.

1957) 148 F.Supp. 482: "Both the tort of interference with contract relations and the tort of interference with prospective contract or business relations involve basically the same conduct on the part of the tortfeasor. In one case the interference takes place when a contract is already in existence, in the other, when a contract would, with certainty, have been consummated but for the conduct of the tortfeasor. . . ." (*Id.*, at p. 484, fn. 1.)

In the present case the alleged interference was to an established contractual relationship, i.e., the license agreement between appellants and Woolworth. Thus, although under the rationale of *Buckaloo, supra,* the tort in this case *is* an interference with "prospective economic advantage" or "business relations," it is more accurately an interference with an *existing* contractual relationship. For that reason, the relevant tort in this case will henceforth be referred to as "interference with contractual relations."

Having resolved the definitional difficulties, we turn to the primary issue: are the jury verdicts finding Woolworth not liable for breach of contract and Bigarani not liable for interference with contractual relations inconsistent with a finding that all defendants are liable for *conspiracy* to interfere with contractual relations? We conclude that the verdicts are inconsistent.

■ Before commencing our analysis it is useful to first note what is not in dispute. It is agreed that a party to a contract cannot be held liable for interfering with his *own* contractual relations. (*Rosenfeld, Meyer & Susman* v. *Cohen* (1983) 146 Cal.App.3d 200, 225 [194 Cal.Rptr. 180]; *Dryden* v. *Tri-Valley Growers, supra,* 65 Cal.App.3d at pp. 998-999.)[5] However, in California at least, a contracting party may be held liable for *conspiring* with third parties to interfere with his own contractual relations.[6] This rule was first articulated in *Wise* v. *Southern Pacific Co., supra,* 223 Cal.App.2d 50, 64-65, 71-72, and has been reiterated in several recent cases. (*Rosenfeld, Meyer & Sussman* v. *Cohen, supra,* 146 Cal.App.3d at p. 225; *Olivet* v. *Frischling* (1980) 104 Cal.App.3d 831, at p. 838 [164 Cal.Rptr. 87]; see also, Note, *supra,* 8 Loyola L.A. L.Rev. at p. 314.) ■ The issue in

---

[5]The reason was stated in *Dryden* v. *Tri-Valley Growers, supra,* 65 Cal.App.3d at page 999: "It is obvious that if an action is brought for interference with contractual relationship by one party to a contract against another who is also a party to that same contract, the grievance of the plaintiff is, in essence, breach of contract; and, in such case, plaintiff is entitled to recover all damages flowing from the breach. In such an instance to allow the plaintiff to sue under the tort theory of wrongful interference with contractual rights would not only be superfluous, but also would enable him to recover tort damages (e.g., punitive damages, damages for mental suffering) to which he is not entitled under California law."

[6]This view is by no means universally held. The New York courts, for example, hold that a party to a contract cannot be found liable for conspiring to interfere with his own contract. (See Note, *supra,* 8 Loyola L.A. L.Rev. at p. 314 and cases cited at fn. 47.) Indeed, the California view has been subjected to considerable criticism. (See *id.*, at pp. 316-319.)

this case, however, is not whether a party to a contract may be found liable for conspiring to interfere with his own contract, as he clearly may, but whether a civil conspiracy to interfere with contractual relations will lie against both parties and nonparties to the contract (Woolworth, LeFevre and Bigarani) even though the only nonparty (Bigarani), standing alone, was vindicated of liability on the underlying tort.

■ In order to answer this question, it is necessary to understand the nature of an actionable civil conspiracy. A civil conspiracy, no matter how manifest and egregious, does not give rise to a cause of action unless an underlying civil wrong has been committed resulting in damage.[7] (*Unruh* v. *Truck Insurance Exchange* (1972) 7 Cal.3d 616, 631 [102 Cal.Rptr. 815, 498 P.2d 1063]; *Mox Incorporated* v. *Woods* (1927) 202 Cal. 675, 677 [262 P. 302]; *Rosenfeld, Meyer & Susman* v. *Cohen, supra,* 146 Cal.App.3d at p. 224; *117 Sales Corp.* v. *Olsen* (1978) 80 Cal.App.3d 645, 649 [145 Cal.Rptr. 778]; *Wise* v. *Southern Pacific Co., supra,* 223 Cal.App.2d at p. 54.) As stated in *Mox Incorporated, supra:* "[T]he major significance of the conspiracy lies in the fact that it renders each participant in the wrongful act responsible as a joint tort-feasor . . . irrespective of whether or not he was a direct actor and regardless of the degree of his activity." (202 Cal. at pp. 677-678; see also, *Unruh* v. *Truck Insurance Exchange, supra,* 7 Cal.3d at p. 616.) ■ The advantage to a litigant in charging a civil conspiracy is to implicate all participating in the common design and to fasten liability on him who agreed to the plan to commit the wrong as well as on him who carried it out. (*Unruh* v. *Truck Insurance Exchange, supra,* 7 Cal.3d at p. 631; *Mox Incorporated* v. *Woods, supra,* 202 Cal. at pp. 677-678; *117 Sales Corp.* v. *Olsen, supra,* 80 Cal.App.3d at p. 649; *Allen* v. *Powell* (1967) 248 Cal.App.2d 502, 508 [56 Cal.Rptr. 715, 29 A.L.R.3d 1218]; *Wise* v. *Southern Pacific Co., supra,* 223 Cal.App.2d at p. 64.) ■ Most importantly for present purposes, *to establish liability on the basis of conspiracy the facts must show something was done, which, without conspiracy, would give rise to a cause of action.* (*117 Sales Corp.* v. *Olsen, supra,* 80 Cal.App.3d at p. 649; *Zumbrun* v. *University of Southern California* (1972) 25 Cal.App.3d 1, 12 [101 Cal.Rptr. 499, 51 A.L.R.3d 991]; *Widdows* v. *Koch* (1968) 263 Cal.App.2d 228, 234 [69 Cal.Rptr. 464].)

■ Measuring the verdicts in this case against the standard just articulated, we conclude that the facts as construed by the jury do not, *without conspiracy,* give rise to a cause of action for interference with contractual relations or interference with prospective economic advantage. In the ab-

---

[7]Compare criminal conspiracy which is a separate crime that can be proved by showing a mere combination for an unlawful purpose, or, at most, a combination for an unlawful purpose coupled with some "overt act" in furtherance of the unlawful plan. (Perkins & Boyce, Criminal Law (3d ed. 1982) pp. 682, 685.)

sence of the conspiracy the jury vindicated Bigarani (the third party) of having interfered with the contractual relations between Woolworth and appellants. In the absence of conspiracy, Woolworth (and LeFevre as Woolworth's agent) are incapable of interfering with their own contractual relationship with appellants.[8] (*Rosenfeld, Meyer & Susman v. Cohen, supra,* 146 Cal.App.3d at p. 225; *Dryden v. Tri-Valley Growers, supra,* 65 Cal.App.3d at pp. 998-999.)

The rationale of the rule first articulated in *Wise v. Southern Pacific Co., supra,* 223 Cal.App.2d 50, is that a party to a contract can be liable for conspiracy to interfere with his own contract (an act which he is incapable of performing directly) because his liability for the interference is *derived* from the wrongful interference committed by his co-conspirator. As stated in *Rosenfeld, Meyer & Sussman, supra,* "[t]o the extent a wrongful act, apart from the conspiracy itself, may be necessary to impose liability in tort on a party to a contract . . ., it is found in the interfering conduct of the third party coconspirator, for which conduct all conspirators are liable, including the contracting party." (146 Cal.App.3d at p. 226.)

In the present case, Woolworth's and LeFevre's liability cannot be derived from Bigarani's liability because the jury specifically found that Bigarani, standing alone, was not liable for the underlying tort. We must therefore conclude that the jury verdict vindicating Bigarani on the individual cause of action for interference with contractual relations is inconsistent with the jury verdict finding all respondents liable for conspiracy to interfere with contractual relations.

## II.

Having concluded that the jury verdicts are inconsistent and irreconcilable, the question remains as to what effect this inconsistency in the verdicts has on the judgments below. ■ Respondents note that appellants did not appeal directly from the judgment entered in favor of Bigarani on the cause of action for interference with contractual relations against Bigarani alone. Because of this, they claim, the judgment in favor of Bigarani is now final and this court has no authority to upset that judgment. Respondents further claim that since we conclude that conspiracy will lie in this case only if Bigarani is found liable on the underlying tort, principles of collateral estoppel require that we enter judgment in favor of respondents on the cause of action for civil conspiracy. (*Remy v. Exley Produce Express, Inc.* (1957)

---

[8]We note also that Woolworth, and LeFevre as its agent, were unable, as a matter of law, to conspire together to interfere with the contract. (*Wise, supra,* 223 Cal.App.3d at pp. 72-73.)

148 Cal.App.2d 550, 555-556 [307 P.2d 65].) In *Remy,* however, an appeal was taken *directly* from a judgment. (*Id.,* at p. 552.) The *Remy* court found that the judgment appealed from was inconsistent with another judgment which was not appealed from, but held that it could not upset the unappealed judgment since it was final. (*Ibid.*)

By contrast, in the present case, appellants appealed from an *order granting a limited new trial.* Under these circumstances we believe that we are authorized—and in fact required—to set aside *both* inconsistent verdicts, since the inconsistency rendered "both verdicts equally against the law, . . . ." (*Morris* v. *McCauley's Quality Transmission Service* (1976) 60 Cal.App.3d 964, 973 [132 Cal.Rptr. 37]; see also *Tolley* v. *Engert* (1925) 71 Cal.App. 439, 440, 442 [235 P. 651].)

We believe that our authority to order reversal of the judgment in favor of Bigarani alone is clearly established by *Hamasaki* v. *Flotho* (1952) 39 Cal.2d 602 [248 P.2d 910]. In *Hamasaki,* Justice Traynor was faced with a procedural problem analogous to the one before us. In that case, the trial judge granted plaintiffs' motion for a new trial in a personal injury action on the issue of damages only because he found that the damages were inadequate. The defendant appealed from the order granting the motion for a new trial. (*Id.,* at p. 604.) On review, the Supreme Court found that the inadequate damages awarded in the case were the result of a compromise verdict reflecting the jury's doubts about liability. Since the compromise verdict cast doubt on the liability portion of the judgment, as well as the damages, the court concluded that the order granting a limited new trial on the issue of damages *alone* had to be reversed. (*Id.,* at p. 607.) The plaintiffs contended that if the Supreme Court concluded reversal was necessary with respect to the limited issue of damages they were entitled to a new trial on *all* issues in the case, that is, on the issues of liability *and* damages. The defendants, however, argued that the Supreme Court had jurisdiction only to affirm or reverse the order granting a *limited* new trial, since neither party had appealed from the judgment and the time for filing notice of appeal had passed. (*Id.,* at p. 608.) In other words, defendants argued that the Supreme Court had no authority to order reversal of the finding of liability (and therefore set the matter for new trial) since no appeal had been taken from the judgment which incorporated that finding.

In rejecting this argument, Justice Traynor stated: "The only appeal before us is that from the order granting plaintiffs' motion for a limited new trial. In disposing of this appeal we have jurisdiction to do no more than the trial court itself could have done. [Citations.] The controlling question, therefore, is whether or not the trial court, on plaintiffs' motion for a new trial on the issue of damages only, had power to grant a new trial on all

issues." (*Id.*, at p. 608.) Since, for reasons we need not assay here, the Supreme Court concluded that the trial court *did* have the power to grant a new trial on all issues, it remanded the cause to the trial court with directions to vacate the judgment and order a new trial on all issues. (*Id.*, at p. 612.)

Similarly, in this case, appellants have appealed from the order granting respondents' motion for new trial. "In disposing of this appeal we have jurisdiction to do no more than the trial court itself could have done." (*Hamasaki, supra,* 39 Cal.2d at p. 608.) Therefore, "the controlling question . . . is whether or not the trial court, on [respondents'] motion for new trial" had power to grant a new trial on the cause of action against Bigarani alone, as well as on the cause of action for conspiracy. (*Ibid.*) Unquestionably, the trial court did have that power.

In their motion for new trial and judgment N.O.V. respondents did not explicitly limit their attack to the conspiracy verdict. In fact, respondents argued alternatively that the inconsistency in the verdicts required that judgment be entered in their favor on the conspiracy cause of actions *and* that the inconsistency justified a new trial in that it rendered the verdicts against the law. Respondents did not restrict their request for new trial to the cause of action for conspiracy only. Thus, if the trial judge had properly found that the verdicts were inconsistent, he would have had the power to reverse *both* judgments, and in fact would have been compelled to do so by *Morris* v. *McCauley's Quality Transmission Service, supra,* 60 Cal.App.3d at page 973.

▉ The trial court granted the motion for new trial as to "the cause of action for conspiring to interfere with business relationship only." Since we have concluded that the inconsistency rendered both verdicts equally against the law, the order cannot be affirmed in its present form. We therefore modify the order granting respondents' motion for a new trial to require retrial of the cause of action for "interference with a business relationship" against Bigarani alone, as well as for "conspiring to interfere with a business relationship." As so modified the order granting new trial is affirmed. In addition, the judgment in favor of Bigarani on the cause of action for "interference with a business relationship" against him alone is reversed and remanded to the trial court for a new trial.[9]

III.*

. . . . . . . . . . . . . . . . . . . . . . . .

[9]In light of our conclusion that a new trial was warranted because of inconsistent verdicts, we do not address appellants' contention that the judge erred when he granted a new trial on the grounds that the damages awarded were excessive.

*See footnote 1, *ante*, page 588.

## IV.

*Disposition.*

The judgment in favor of Bigarani on the cause of action for "interference with a business relationship" against Bigarani only is reversed. The order granting a new trial is modified to require retrial of appellants' second cause of action (interference with contractual relations against Bigarani only) as well as appellants' third cause of action (conspiracy to interfere with contractual relations). The cause is remanded to the trial court for a new trial on those causes of action only. On remand, the trial court is directed to receive evidence of Woolworth's financial condition subject to the right of Woolworth to move for a protective order pursuant to Civil Code section 3295.

In all other respects the orders and judgments appealed from are affirmed.

Each party to bear its own costs on appeal.

Smith, J., and Flaherty, J.,* concurred.

The petition of plaintiffs and appellants for a hearing by the Supreme Court was denied October 31, 1984.

---

*Assigned by the Chairperson of the Judicial Council.