Opinion
 

 HOLLENHORST, Acting P. J.
 

 Plaintiffs Roger D. Colbaugh, a real estate broker, and Rodney L. Niebuhr, a real estate salesperson associated with him, sued to recover a commission allegedly due them as cooperating brokers who were the procuring cause of the sale of certain real property.
 

 After settling the case with the buyers of the property and the real estate agents who received the cooperating brokers’ commission, plaintiffs went to trial against defendants Hartline and Neville, the sellers of the property. At the conclusion of plaintiffs’ case, the trial court granted defendants’ motion for a nonsuit. Plaintiffs appeal the ensuing judgment.
 

 The trial court also granted defendants’ motion for an order awarding them attorney fees as costs pursuant to Code of Civil Procedure section 1021.1. The trial court found that defendants had made an offer of settlement pursuant to Code of Civil Procedure section 998 which entitled defendants to the award of their attorney fees. The court therefore awarded defendants $25,974 for their costs in the action, including attorney fees. Plaintiffs also appeal this award.
 

 Facts
 

 Defendants Hartline and Neville owned the Deep Creek Ranch in Apple Valley. Desiring to sell the property, they listed the property for sale with Carl Tate, a broker for Spring Valley Lake Realty. The listing agreement was a standard form “Exclusive Authorization to Sell” between sellers and Spring Valley. It provides that sellers will pay the agent, Spring Valley, a 6 percent commission upon sale of the property and under other circumstances not relevant here. The agreement also provides that the sellers authorize the agent, Spring Valley, to cooperate with subagents.
 

 The property was sold to James and Madeline Tatum for $2,310,980 on February 6,1989. At closing, sellers paid a 6 percent real estate commission.
 
 *1521
 
 Pursuant to the escrow instructions, 3 percent was paid to Spring Valley and 3 percent was paid to Regal Realty and its agent Bruce Schoffstall.
 

 Prior to the close of escrow, plaintiff Niebuhr made demand for payment of the 3 percent commission to him on grounds that he was entitled to the cooperating broker’s commission because he, and not Regal, was the procuring cause of the transaction. While plaintiffs submitted substantial evidence that they were the procuring cause of the transaction, the jury was not allowed to rule on this factual issue.
 

 Defendant sellers successfully argued in the trial court, as they do on appeal, that their full payment of the commission as provided in the listing agreement prevents them from being found in breach of that agreement. Plaintiffs respond that payment to the wrong person, i.e., Regal, does not discharge the sellers’ obligation to them. They therefore urge that the failure to pay them was a breach of the listing agreement.
 

 Standard of Review
 

 “A defendant is entitled to a nonsuit if the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to permit a jury to find in his favor. [Citation.] ‘In determining whether plaintiff’s evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded. . . .’ [f] In reviewing a grant of nonsuit, we are ‘guided by the same rule requiring evaluation of the evidence in the light most favorable to the plaintiff.’ [Citation.] We will not sustain the judgment ‘ “unless interpreting the evidence most favorably to plaintiffs case and most strongly against the defendant and resolving all presumptions, inferences and doubts in favor of the plaintiff a judgment for the defendant is required as a matter of law.” ’ ”
 
 (Nally
 
 v.
 
 Grace Community Church
 
 (1988) 47 Cal.3d 278, 291 [253 Cal.Rptr. 97, 763 P.2d 948].)
 

 “On appeal from a judgment on a directed verdict, appellate courts view the evidence in the light
 
 most favorable to appellant.
 
 All conflicts must be resolved and inferences drawn in appellant’s favor; and the judgment will be reversed if there was substantial evidence . . . tending to prove all elements of appellant’s case.” (Eisenberg, Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 1994) f 8:138.) We should therefore reverse the trial court if we find legal merit to their claim and substantial evidence supporting plaintiffs’ theory that the sellers breached their agreement with the listing broker when they paid the full commission to that broker and another cooperating broker.
 

 
 *1522
 
 Discussion
 

 Plaintiffs’ initial legal contention is that a cooperating broker has standing to sue the sellers of real property to recover an unpaid commission. Their claim was based on
 
 Steve Schmidt & Co.
 
 v.
 
 Berry
 
 (1986) 83 Cal.App.3d 1299, 1311-1313 [228 Cal.Rptr. 689]. In that case, Steve Schmidt & Co. was the cooperating broker and Mr. Berry was the seller of the property. Mr. Berry entered into an exclusive listing agreement with a broker to sell the property. The broker, Tingey, entered into a written letter agreement with Schmidt & Co. stating that it would be paid a commission if it found a buyer for the property on certain terms and conditions. Thereafter, the seller attempted to enlarge the terms of the original listing agreement by adding other terms and conditions. Broker Schmidt, acting individually and not on behalf of his company, then offered to buy the property on the exact terms of the original listing agreement. Upon seller’s refusal to sell on the basis of those terms, the cooperating broker, Schmidt & Co. sued the seller for its commission.
 

 The court held that the broker was entitled to a commission because it had produced a ready, willing and able buyer.
 
 (Steve Schmidt & Co.
 
 v.
 
 Berry, supra,
 
 183 Cal.App.3d 1299, 1305, 1309-1311.) It also found that the terms of sale were sufficiently stated, and that Mr. Schmidt was able to purchase the property. It then considered the issue presented here, i.e., whether the cooperating broker had standing to sue the seller for a commission. The court concluded that the broker had standing. The listing agreement there provided that the owner authorized the listing agent to cooperate with other brokers and to divide any commission due under the agreement with them.
 
 (Id.,
 
 at p. 1311.) The listing agent then entered into a written agreement with Schmidt & Co. that provided that the commission would be divided if Schmidt & Co. procured a buyer for the property. The court held that the language of the listing agreement was sufficient to authorize the listing broker “to appoint subagents who could bind the principal, thus making Berry (the principal) directly responsible for the commission.”
 
 (Ibid.)
 
 In addition to the direct contract theory, the court also held that the cooperating broker could be held liable on a third party beneficiary theory because cooperating brokers were members of a class which was intended to be directly benefitted by the seller’s promise to pay a commission.
 
 (Id.,
 
 at p. 1313.)
 

 Here, the listing broker, Mr. Tate, testified that the listing agreement authorized him to present the property to other brokers, directly and through
 
 *1523
 
 the Multiple Listing Service.
 
 [1]
 
 He did so by distributing property information packets to at least seven brokers. Other salespersons in his office also distributed information about the property.
 

 The buyer here, Mr. Tatum, also testified that he had been approached by a number of brokers and real estate salespersons with regard to the subject property, including plaintiff Niebuhr.
 

 We find the
 
 Schmidt
 
 case distinguishable because here (1) there was no evidence that the listing broker, Mr. Tate, ever agreed to employ plaintiff Niebuhr as a subagent; and (2) the seller paid the full 6 percent commission in accordance with the terms of the listing agreement.
 

 Thus, in
 
 Schmidt,
 
 there was a written agreement between the listing broker, Mr. Tingey, and the cooperating broker, Schmidt & Co.
 
 (Steve Schmidt & Co.
 
 v.
 
 Berry, supra,
 
 183 Cal.App.3d 1299, 1304.) There was no such written agreement here.
 
 [2]
 
 Plaintiff Niebuhr was merely one of a number of brokers who were given materials soliciting an offer to buy the property. There was no evidence that the listing broker, Mr. Tate, specifically agreed to employ him as a subagent. There was also no evidence that Mr. Tate promised him that the sellers would pay him a commission if he was the procuring cause of a sale of the property.
 
 [3]
 

 “When the cooperating broker is the procuring cause of the sale, his recovery from the listing broker is limited to the terms of the cooperation agreement. Usually this agreement expressly or impliedly limits the rights of the cooperating broker to receive a portion of the commission actually received by the listing broker. . . . [f]. . . Whether the broker has a direct cause of action against the owner depends upon whether the owner was aware of, or expressly authorized, the cooperation agreement between the
 
 *1524
 
 listing broker and the cooperating broker, whether the seller accepted the buyer’s offer by executing a contract of sale, and whether the sale to the buyer was consummated.” (1 Miller & Starr,
 
 op. cit. supra,
 
 § 2:30, pp. 623-624.) There was no evidence of such a written cooperation agreement here.
 

 “Any action against either the vendor or the vendee group based on contract or implied contract must fail for want of compliance with the statute of frauds. Civil Code section 1624, subdivision 5 [now subdivision (d)], requires a writing subscribed by the party to be charged for ‘An agreement authorizing or employing an agent, broker, or any other person to purchase or sell real estate, . . . or to procure, introduce, or find a purchaser or seller of real estate ... for compensation or a commission.”
 
 (Buckaloo
 
 v.
 
 Johnson
 
 (1975) 14 Cal.3d 815, 821 [122 Cal.Rptr. 745, 537 P.2d 865]; see generally, 1 Miller & Starr,
 
 op. cit. supra,
 
 § 1:78, pp. 229-236.)
 

 In
 
 Schmidt,
 
 the listing agreement specifically authorized the listing agent to divide any commission due under the agreement with subagents. There was no such provision in the listing agreement here. The agreement here only authorized cooperation with subagents. It required the sellers to pay the agent, defined to be Spring Valley Lake Realty, a 6 percent commission upon sale of the property. In
 
 Schmidt,
 
 the sellers refused to pay any commission at all. Here, in accordance with the listing agreement, the full 6 percent commission was paid by the sellers.
 

 “The contents of a listing agreement, not its label, determine the parties’ rights. [Citation.] Any right to compensation asserted by a real estate broker must arise from the four comers of the employment contract, which is strictly enforced according to its lawful terms.”
 
 (Howard Gitlen & Associates, Inc.
 
 v.
 
 Ameri
 
 (1989) 208 Cal.App.3d 90, 95 [256 Cal.Rptr. 36];
 
 R. J. Kuhl Corp.
 
 v.
 
 Sullivan
 
 (1993) 13 Cal.App.4th 1589, 1599 [17 Cal.Rptr.2d 425].)
 

 Pursuant to the escrow instructions, the brokers’ commission was divided between the listing agent and Regal Realty. Although the listing agent drafted the escrow instructions, there was no specific evidence explaining this provision of the escrow instructions. Presumably, the listing agent, Spring Valley, agreed to split its commission with Regal and directed the sellers to divert 3 percent of the listing agent’s commission to Regal. Indeed, Mr. Tate testified that he thought he had the right to determine how to split the 6 percent commission. Since Mr. Tate directed the payment of 3 percent of the commission to Regal, plaintiffs’ complaint is with his firm, the listing agents, not with the sellers. The sellers did what they agreed to
 
 *1525
 
 do: they paid a 6 percent commission to the listing agent and its designee. We therefore agree with defendants that, even if plaintiffs had standing to sue the sellers on a contract theory, there was no evidence of a breach of the listing agreement.
 

 As noted above, plaintiffs argue that the sellers cannot discharge their contractual obligations to plaintiffs by paying the wrong persons. However, the “right” person to receive a commission under the listing agreement was the listing agent, Spring Valley. That commission was paid. Thus, even if plaintiffs are considered to be third party beneficiaries of the listing agreement, there was no breach of that agreement. If Spring Valley, the person entitled to a commission under the terms of the listing agreement, instructed the seller to pay a portion of the commission it was entitled to receive under the listing agreement to the “wrong” person, i.e., a broker who was not the procuring cause of the transaction, it seems that plaintiffs’ complaint should properly have been made against the listing agent, not against the sellers. “When the cooperating broker is the procuring cause of the sale, his recovery from the listing broker is limited to the terms of the cooperation agreement. . . . [T]he cooperating broker can sue the listing broker for his share of the commission already paid to the listing broker . . . .” (1 Miller & Starr,
 
 op. cit.
 
 supra, § 2:30, p. 623.)
 

 The
 
 Schmidt
 
 court discusses and refuses to follow
 
 Goodwin
 
 v.
 
 Glick
 
 (1956) 139 Cal.App.2d Supp. 936 [294 P.2d 192], on grounds that it is inconsistent with Civil Code section 2351. In
 
 Goodwin,
 
 the court found that the fact that the listing agreement was an exclusive listing agreement meant that any subagents were agents of the listing agent, not of the sellers. (139 Cal.App.2d at p. 940.) We agree with
 
 Goodwin
 
 under the circumstances presented here. There is no inconsistency with the statute here because, as noted above, the statute only applies when the subagent has been lawfully appointed, and there was no evidence of such an appointment.
 

 Plaintiffs emphasize the facts supporting their conclusion that they were the procuring cause of the sale. They also presented an expert witness who so testified. In granting the nonsuit, however, the trial court found that plaintiffs were not the procuring cause: it said: “[I]n applying the facts of this case to the applicable law the Court concludes as follows: That the evidence is not sufficient to support Plaintiff’s [sic] claim that he [sic] was the procuring cause broker in this land sale. And that the Plaintiff [sic] is not a third party beneficiary to the land sale contract in this case.”
 

 We agree with plaintiffs that the trial court applied an erroneous standard in deciding the nonsuit motion, and improperly preempted the province of
 
 *1526
 
 the jury by deciding that plaintiffs were not the procuring cause of the sale. Plaintiffs presented ample evidence, including the. opinion of an expert, that they were the procuring cause of the sale. The trial court had no basis for disregarding that testimony on a nonsuit motion. As noted above, the question of which broker was the procuring cause of the sale was a factual issue which should have been determined by the jury.
 
 (Buckaloo
 
 v.
 
 Johnson, supra,
 
 14 Cal.3d 815, 820-821, fn. 2.)
 

 Nevertheless, we find that the motion for nonsuit was properly granted on the legal grounds discussed above.
 
 [4]
 

 The Attorney Fee Award
 

 The trial court’s award of attorney fees was based on Code of Civil Procedure sections 1021.1 and 998.
 
 [5]
 
 Section 1021.1, dealing with an award of attorney fees in the event of rejection of a settlement offer under section 998, is an experimental section applicable for a limited period of time in Riverside and San Bernardino Counties. (§ 1021.1, subds. (h) & (i).)
 

 Under the experimental procedure, the trial court has discretion to award attorney fees if a section 998 offer was made, it was not accepted, and the party rejecting the offer failed to obtain a more favorable judgment. (§ 1021.1, subd. (b).) Here, defendants offered $100 to settle the case, the offer was rejected, and plaintiffs failed to obtain a more favorable judgment.
 

 The trial court awarded defendants attorney fees and costs in the sum of $25,974. Although the action was filed on November 30, 1989, the attorney fees were allowed for the period from July 1,1991. The trial court concluded that, as a result of depositions and other discovery, plaintiffs knew they did not have a good case after that date, and the $100 settlement offer, made on May 15,1990, then became reasonable. Plaintiffs’ claim at that time was for approximately $69,000.
 

 We discuss three issues. First, did defendants meet the requirement of section 1021.1, subdivision (b), that they make a proper offer for judgment under section 998? Second, did the trial court abuse its discretion under section 1021.1, subdivision (c), in exercising its discretion to award attorney
 
 *1527
 
 fees? Third, did the trial court abuse its discretion under section 1021, subdivision (d), in determining the amount of attorney fees to be awarded?
 

 The first issue is whether the initial conditions of section 1021.1, subdivision (b) have been met, i.e., whether the $100 offer was a valid settlement offer under section 998. Plaintiffs contend it was not. They argue that section 998 can only be triggered by a valid, nontoken offer. They rely on
 
 Wear
 
 v.
 
 Calderon
 
 (1981) 121 Cal.App.3d 818 [175 Cal.Rptr. 566], In that case, the owner of a car involved in a collision gave plaintiff a $1 settlement offer. When the jury reached a defense verdict, the owner sought payment of an expert witness’s fee under section 998. The court held that the $1 offer was insufficient. The court said: “We believe that in order to accomplish the legislative purpose of encouraging settlement of litigation without trial [citation], a good faith requirement must be read into section 998. In other words, the pretrial offer of settlement required under section 998 must be realistically reasonable under the circumstances of the particular case. Normally, therefore, a token or nominal offer will not satisfy this good faith requirement, particularly where, as here, there is no cross-complaint.” (121 Cal.App.3d at p. 821.) The court pointed out that the plaintiff was awarded $18,500 in damages from other defendants. It went on to explain: “A plaintiff may not reasonably be expected to accept a token or nominal offer from any defendant exposed to this magnitude of liability unless it is absolutely clear that no reasonable possibility exists that the defendant will be held liable. If that truly is the situation, then a plaintiff is likely to dismiss his action without any inducement whatsoever. But if there is some reasonable possibility, however slight, that a particular defendant will be held liable, there is practically no chance that a plaintiff will accept a token or nominal offer of settlement from that defendant in view of the current cost of preparing a case for trial.”
 
 {Id.,
 
 at p. 821.)
 

 Subsequently, in
 
 Elrod
 
 v.
 
 Oregon Cummins Diesel, Inc.
 
 (1987) 195 Cal.App.3d 692 [241 Cal.Rptr. 108], the court approved the good faith requirement of
 
 Wear
 
 v.
 
 Calderon, supra,
 
 121 Cal.App.3d 818. In that case, a $15,000 offer was held to be token when the damages exceeded $1 million. The court said: “Section 998 should be interpreted so as to effectuate its purpose of encouraging the settlement of lawsuits before trial. [Citation.] Section 998 achieves its aim by punishing a party who fails to accept a
 
 reasonable
 
 offer from the other party. [Citations.] An offeree cannot be expected to accept an unreasonable offer. Hence, any subsequent punishment of the offeree for nonacceptance does not further the purpose of section 998, because the offeree would not have acted differently at the time of the offer despite the threat of later punishment. In these circumstances, later punishment of the offeree merely provides a windfall to the offeror and does not
 
 *1528
 
 encourage settlements. ... [S[] As a general rule, the reasonableness of a defendant’s offer is measured, first, by determining whether the offer represents a reasonable prediction of the amount of money, if any, defendant would have to pay plaintiff following a trial, discounted by an appropriate factor for receipt of money by plaintiff before trial, all premised upon information that was known or reasonably should have been known
 
 to the defendant.
 
 It goes without saying that a defendant is not expected to predict the exact amount of his exposure. If an experienced attorney or judge, standing in defendant’s shoes, would place the prediction within a range of reasonably possible results, the prediction is reasonable. . . . ffl If the offer is found reasonable by the first test, it must then satisfy a second test: whether defendant’s information was known or reasonably should have been known to plaintiff. This second test is necessary because the section 998 mechanism works only where the offeree has reason to know the offer is a reasonable one. If the offeree has no reason to know the offer is reasonable, then the offeree cannot be expected to accept the offer.”
 
 (Elrod, supra,
 
 195 Cal.App.3d at pp. 698-699.) The court also emphasized its view that, since the judgment was prima facie evidence of the reasonableness of the offer, the burden was on the plaintiff (the offeree) to show otherwise. The court also stated that the question of whether an offer was reasonable and made in good faith is a matter within the discretion of the trial court. It is tested by an abuse of discretion standard of review.
 

 Defendants, on the other hand, cite this court’s decision in
 
 Culbertson
 
 v.
 
 R. D. Werner Co., Inc.
 
 (1987) 190 Cal.App.3d 704 [235 Cal.Rptr. 510], In that case, defendant offered $5,000 on a $1.5 million claim. After a defense verdict, defendants sought reimbursement for the costs of their expert witnesses. This court found the offer reasonable: “Reduced to its simplest terms, the essence of plaintiff’s argument is that the filing of a complaint for damages, no matter how unmeritorious the claim might be, imposes upon a defendant, no matter how meritorious its defense may be, an obligation to reward the plaintiff by making an offer of settlement which would liquidate any outstanding liens, pay plaintiff’s attorney’s fees and costs and yield some significant sum to the plaintiff, or lose the benefits of section 998. That, of course, is diametrically opposed to the clear language and intent of section 998. Such a strained interpretation of the statute and the cases would result in an increase of spurious lawsuits and a reduction in the number of settlements.”
 
 (Id.,
 
 at pp. 709-710.)
 

 We also found that the plaintiff had not met the burden of showing that the trial court abused its discretion in allowing the expert witness fees. We said: “When a defendant perceives himself to be fault free and has concluded that he has a very significant likelihood of prevailing at trial, it is consistent
 
 *1529
 
 with the legislative purpose of section 998 for the defendant to make a modest settlement offer. If the offer is refused, it is also consistent with the legislative intent for the defendant to engage the services of experts to assist him in establishing that he is not liable to the plaintiff. It is also consistent with the legislative purpose under such circumstances to require the plaintiff to reimburse the defendant for the costs thus incurred. It is clear that the Legislature adopted the statute to encourage early settlement of lawsuits to avoid the time delay and economic waste of trial, and to reduce the number of meritless lawsuits by requiring the losing party to pay the costs incurred by the prevailing party.”
 
 (Culbertson
 
 v.
 
 R. D. Werner Co., Inc., supra,
 
 190 Cal.App.3d 704, 710-711; see also
 
 Pineda
 
 v.
 
 Los Angeles Turf Club, Inc.
 
 (1980) 112 Cal.App.3d 53 [169 Cal.Rptr. 66].)
 

 Defendants factually argue that plaintiffs eventually settled their claim with the other parties for nominal sums in the $2,500 to $5,000 range. More importantly, they focus on the information known to them and to plaintiffs at the time the offer was pending. The complaint was filed on November 30, 1989, and the section 998 offer was dated May 15, 1990. It expired June 15, 1990. By that time, defendants had asked plaintiffs to dismiss them from the lawsuit at least three times. On January 2, 1990, defendants advised plaintiffs that there was no agreement between defendants and plaintiffs. On April 26,1990, defendants advised plaintiffs that discovery up to that time had not established any basis for liability. On June 12, 1990, while the offer was pending, defendants again told plaintiffs that there was no contract between the parties, and that the commission called for in the listing agreement had been paid. The June 12th letter also specifically advised plaintiffs that they were risking an award of attorney fees against them under the experimental procedure of section 1021.1.
 

 While the issue is a close one, we agree with defendants that the granting of the defense motion for a nonsuit established the validity of their position. This position was clearly communicated to plaintiffs prior to the expiration of the section 998 offer. The burden was thus on plaintiffs to show that the trial court abused its discretion in awarding attorney fees to defendants. Since plaintiffs knew, or should have known, that they had no written commission agreement from either the seller or the listing agent, and since they knew, or should have known, that the 6 percent commission stated in the listing agreement had been paid, the trial court would have been within its discretion in finding that the defendants’ settlement offer was realistic when made, and was not a token offer. We therefore find that such a conclusion would have met the initial requirement of section 1021.1, subdivision (b), that a proper offer was made under section 998. However, as discussed below, the trial court did not discuss the issue and it is unclear whether it found the offer was a reasonable one when made.
 

 
 *1530
 
 Assuming a proper offer was made, the next question is whether the trial court abused its discretion under section 1021.1, subdivision (c), in exercising its discretion to award attorney fees. Section 1021.1, subdivision (c), provides standards for the trial court to consider in deciding whether to award attorney fees: “In exercising its discretion to award attorney’s fees the court shall consider the following factors: [¶] (1) The reasonableness or lack thereof, of a party’s failure to accept an offer for judgment under Section 998 in light of the facts known to the party at the time, of
 
 [sic]
 
 which, in light of all of the circumstances, should have been known to the party.” Subdivision (1) also provides that the trial court should consider seven specified factors in making a reasonableness determination, including the merit, or lack of merit, in the claim and the closeness of the factual and legal issues. The subdivision also requires the court to consider the amount of damages sought and results obtained, the efforts made to settle the controversy, and the existence of any bad faith or abuse of legal procedure by either side. In announcing its decision, the trial court did not discuss any of these factors.
 

 Assuming the first two hurdles are overcome, the third issue is whether the trial court abused its discretion under section 1021.1, subdivision (d), in determining the amount of attorney fees to be awarded. Here, the trial court substantially reduced the fees sought by defendants to limit recovery to the period after July 1, 1991. Any error in this regard favored plaintiffs, and defendants have not appealed on this issue.
 

 We therefore conclude that the trial court could have exercised its discretion to award attorney fees to defendants under sections 998 and 1021.1. However, the trial court did not so exercise its discretion. Instead, in announcing its tentative decision, the court said: “And in terms of the settlement offer under 998 of $100, that probably wasn’t a reasonable offer until—I think it was July. . . . July 1st of ’91. [1] From that date forward I believe that the plaintiff knew that he didn’t have a case, and that offer was reasonable.” After hearing argument, the court said: “The court isn’t ruling that it was a token offer. The court’s ruling that it was a good faith offer [of] settlement.” The court then explained that it was using the July 1,1991, date even though the offer was pending in May 1990.
 

 The court apparently confused two concepts of reasonableness. As discussed above, it should first have determined whether the offer itself was a valid offer under section 998. To make that determination, it would have to determine if the offer was reasonable. The issue was a close one, and the trial court could have found either way on the issue.
 

 The second reasonableness issue is whether plaintiffs’ failure to accept the offer was reasonable under the circumstances existing at the time the offer
 
 *1531
 
 was made. This issue should have been decided under the criteria stated in section 1021.1, subdivision (c). Specifically, the statute requires the trial court to determine reasonableness under the facts known to plaintiffs at the time plaintiffs failed to accept the offer, i.e., in May 1990. The trial court failed to discuss the issue and appears to have based its award on its conclusion that the failure of plaintiffs to accept the offer became unreasonable in July 1991, 14 months later.
 

 Since the trial court either failed to exercise its discretion or applied improper standards in awarding attorney fees, the award cannot stand. Accordingly, we reverse the order granting attorney fees under sections 998 and 1021.1. On remand, defendants may renew their request for attorney fees pursuant to sections 998 and 1021.1.
 

 Disposition
 

 The judgment of nonsuit is affirmed. The order awarding attorney fees to defendants filed April 9, 1992, is reversed. Defendants are to recover their costs on appeal.
 

 McKinster, J., and McDaniel, J.,
 
 *
 
 concurred.
 

 [1]
 

 Although the complaint relied in part on the Multiple Listing Service rules, it was subsequently shown that plaintiff was not a member of the local Multiple Listing Service. If he had been, the issue of which cooperating broker was the procuring cause of the buyer would normally have been submitted to a committee of the local board of realtors for resolution by arbitration proceedings. (1 Miller & Starr, Cal. Real Estate (2d ed. 1989) § 2:30, p. 623.)
 

 [2]
 

 Civil Code section 2351 provides: “A sub-agent, lawfully appointed, represents the principal in like manner with the original agent; and the original agent is not responsible to third persons for the acts of the sub-agent.” Here, however, there was no “lawfiil appointment” because there was no evidence of a written agreement between the listing agent and plaintiffs.
 

 [3]
 

 As noted above, the brokers did not make contact through the local Multiple Listing Service. “When the listing is filed with the Multiple Listing Service there is an express offer to pay compensation to a member of the Service who procures a buyer; the amount of the compensation is stated as a specific sum or a percentage of the sales price of the property.” (1 Miller & Starr,
 
 op. cit. supra,
 
 § 2:30, p. 621.)
 

 [4]
 

 Parenthetically, we agree with respondent that “the situation here presents a classic dispute between cooperating brokers, as to who among them should be considered the procuring broker.” Such disputes should be resolved by the cooperating brokers among themselves without bringing the seller who has paid the full commission due to the broker named in the listing agreement into the litigation. As noted in footnote 1,
 
 ante,
 
 such disputes are generally resolved by arbitration when a Multiple Listing Service is involved.
 

 [5]
 

 All further statutory references are to the Code of Civil Procedure.
 

 *
 

 Retired Associate Justice of the Court of Appeal, Fourth District, senior judge status (Gov. Code, § 75028.1), sitting under assignment by the Chairperson of the Judicial Council.