Filed 7/30/13  Tardif v. Zatikyan CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| BARBARA TARDIF,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>ARMAN ZATIKYAN et al.,<br><br>    Defendants and Respondents. | B240701<br><br>(Los Angeles County<br>Super. Ct. No. SC105696)<br><br><br>ORDER MODIFYING OPINION<br>AND DENYING REQUESTS FOR<br>PUBLICATION<br>(NO CHANGE IN JUDGMENT) |

THE COURT*

    We have received and reviewed appellant's request for modification, appellant's request for partial publication, and a request for partial publication filed by the California Association of Realtors.

    The requests for publication are denied.  It is ordered that the unpublished opinion filed July 3, 2013 be modified as follows:

    1.  On the title page, the name of counsel for plaintiff and appellant is changed to "Law Office of Gerard L. Friend and Gerard L. Friend for Plaintiff and Appellant."

    2.  The name "Island Shores" is replaced by the name "Island Shore" on page 6, the last line; on page 8, the first full paragraph, last sentence; on page 10, the first line; on

page 12, the second full paragraph, the next to last line; and on page 15, the second full paragraph, line 14.

3. On page 13, the last line on the page, "CS0:2.5%" is replaced by "CSO:2.5%".

4. On page 15, the second full paragraph, in the sentence on line 5 beginning "Tardif alleged that Bolin told the Willises not to contact her; . . ." the word "her" is stricken and the name "Tardif" is substituted so the sentence begins: "Tardif alleged that Bolin told the Willises not to contact Tardif, . . ."

This modification does not change the judgment.

_____
*EPSTEIN, P.J.      WILLHITE, J.      MANELLA, J.

Filed 7/3/13 (unmodified version)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| BARBARA TARDIF, | B240701 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. SC105696) |
| v. | |
| ARMAN ZATIKYAN et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, John H. Reid, Judge. Reversed in part, affirmed in part.

Law Office of Gerald L. Friend and Gerald L. Friend for Plaintiff and Appellant.

Law Offices of Ginzburg & Bronshteyn and Yasha Bronshteyn for Defendants and Respondents Arman Zatikyan and Lilit Grigoryan.

Law Offices of Jerry K. Staub and Jerry K. Staub for Defendant and Respondent Arline Bolin.

Barbara Tardif appeals from a judgment of dismissal entered in her action for a real estate broker's commission after the trial court sustained demurrers to several causes of action alleged in her second, third, and fourth amended complaints. We conclude that she alleged a cause of action for breach of contract against the sellers on a third party beneficiary theory based on the listing agreement entered into by the sellers. Tardif failed to allege a right to recover a commission from the sellers' agent based on the listing of the property with the Multiple Listing Service itself. She adequately alleged a cause of action for intentional interference with prospective economic advantage against the sellers and their broker which is not barred by the statute of limitations or abandoned.

**FACTUAL AND PROCEDURAL SUMMARY**

We take our factual summary from the allegations of the second, third and fourth amended complaints which are at issue in this appeal. In August 2007, Arman Zatikyan and Lilit Grigoryan purchased a residence on Cherokee Lane in Beverly Hills (the Cherokee property) for $9,250,000. In January 2008, they purchased a different property for $18,000,000, necessitating the sale of the Cherokee property. Tardif alleged that Zatikyan and Grigoryan entered into an exclusive listing agreement (Listing Agreement) with defendant Arline Bolin (listing agent) to sell the property. Zatikyan and Grigoryan dispute this, pointing out that the space on the Listing Agreement for seller is filled in with "9311 Cherokee Lane", the address for the property, rather than with their names. We discuss that dispute below, but as we shall explain, it is appropriate to identify Zatikyan and Grigoryan in this opinion as "sellers." The listing period was January 8, 2008 to May 8, 2008.

The Listing Agreement provided that sellers would pay a 1 percent commission to the listing agent and a 2½ percent commission to a "seller broker" who participated in the Multiple Listing Service (MLS), and procured a buyer offering to purchase the property

4

on terms acceptable to the sellers during the listing period (cooperating broker).[1]  On January 8, 2008, the Cherokee property was listed on the MLS with an asking price of $9,495,000.[2]

Tardif is licensed as a California real estate agent and is a participating member of the MLS.[3]  Among her clients were Brian and Snizhana Willis (buyers) who were in the market to purchase property in Beverly Hills.  On April 29, 2008, Tardif showed buyers the Cherokee property.  They instructed her to prepare and present an offer to sellers to purchase the property for $8,600,000.  A provision for payment of a commission to a "cooperating broker" was included in the offer.  Tardif alleged this offer was rejected by sellers, who counteroffered to sell for $9,220,000 under the same terms as the buyers' original offer, including the obligation that sellers pay her a 2½ percent commission as cooperating broker.

The second amended complaint alleged that buyers authorized Tardif to prepare a counter to the counteroffer to purchase the property for $8,900,000.  But after she forwarded that offer to buyers, they advised her that they were no longer interested in purchasing the Cherokee property and instructed Tardif to withdraw all offers.  The sellers never received this counter to the counteroffer.  Tardif withdrew all offers on the property in writing on May 6, 2008.  These allegations are omitted from the third and fourth amended complaints.

---

[1] The Listing Agreement authorized Bolin to offer MLS brokers 2½ percent of the purchase price.

[2] Although the third amended complaint alleges the Cherokee property was listed for $9,495,000, the listing with the MLS, an exhibit to the complaint, states the listing price as "$9,625,000".

[3] At the relevant times, Tardif was employed by Nourmand & Associates, LLC, a licensed California brokerage firm which assigned its right to assert a broker's fee to appellant prior to the filing of this litigation.

Tardif alleged that the same day, May 6, 2008, buyers, utilizing the name "Island Shore Services, LLC", a business entity they owned and which was alleged to be their alter ego, entered into a sales contract with sellers to purchase the Cherokee property for $9,000,000. No buyer's agent was involved in the transaction. Escrow closed on this sale on June 18, 2008.

Tardif sued Zatikyan, Grigoryan, Bolin (collectively "defendants"), and Bolin's agency, Remax Marquee Partners, in November 2009. Sellers answered, and there was a voluntary dismissal of Remax. Tardif was granted leave to amend and filed a first amended complaint in September 2010 which alleged causes of action for 1) breach of contract, 2) breach of contract/third party beneficiary/conspiracy to breach contract; 3) fraud and conspiracy to commit fraud, intentional misrepresentation, and 4) interference with prospective economic advantage. The court sustained a demurrer to all causes of action with leave to amend. The second amended complaint was filed in February 2011. Defendants' demurrers were sustained without leave to amend as to the second cause of action for breach of contract/third party beneficiary and with leave to amend as to the remaining causes of action.

Tardif's third amended complaint alleged causes of action for breach of contract, fraud, and breach of the covenant of good faith and fair dealing. The demurrers were sustained without leave to amend, but Tardif was given leave to file a fourth amended complaint alleging interference with prospective economic advantage. The fourth amended complaint alleged only that tort cause of action. Defendants demurred once again. Their demurrers were sustained without leave to amend and the entire action was dismissed. Orders and judgments of dismissal in favor of Zatikyan, Grigoryan, and Bolin were entered. Defendants gave notice of entry of judgment. This timely appeal followed.

## DISCUSSION

### I

On appeal from a dismissal after an order sustaining a demurrer, we "'"'examine the complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory, such facts being assumed true for this purpose.'" [Citations.]" (*Village Northridge Homeowners Assn. v. State Farm Fire & Casualty Co.* (2010) 50 Cal.4th 913, 921.) "[W]e treat the demurrer as admitting all material facts properly pleaded. '"Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context.'" [Citations.]" (*C.A. v. William S. Hart Union High School Dist.* (2012) 53 Cal.4th 861, 866.)

### II

Tardif argues the trial court erred by sustaining demurrers to her cause of action for breach of contract/third party beneficiary in her second amended complaint. In that cause of action, she alleged that she was an intended third party beneficiary of the Listing Agreement entered into between sellers and Bolin, their listing agent, which is attached to the complaint. Her contract claims against the sellers are based on the Listing Agreement. She also alleged that between May 2008 and August 2009 and thereafter, defendants knew that she had represented the Willises in connection with the Cherokee property. Allegedly, defendants agreed to leave the Cherokee property on the market as an "active" listing until the close of escrow on June 18, 2008, after the listing expired on May 8, 2008. Tardif alleged: "Defendants proceeded to sell the Cherokee Lane Property to ISLAND SHORE SERVICES, LLC, whose owners, managing members and alter egos were and continue to be none other than Plaintiff's clients, BRIAN WILLIS and SNIZHANA WILLIS." The cause of action alleged that the ultimate sale of the property was designed to avoid paying Tardif the 2½ percent commission on the sale.

The "Listing Period" under the Listing Agreement was from January 8, 2008 to May 8, 2008. Paragraph 4 of the Listing Agreement describes the compensation to be paid to "broker," identified as Bolin. Tardif claims a right to a 2½ percent commission under three subparts of paragraph 4.

*A. Compensation Provisions of Paragraph 4*

Subparagraph 4.A. of the Listing Agreement provided form options which were to be checked and filled out for commissions based on either a percentage of the purchase price or a flat dollar amount, all of which were left blank. Tardif relies on the third provision of this subparagraph which reads: "Seller agrees to pay to Broker as compensation for services irrespective of agency relationship(s) . . . 1% to listing 2.5% to seller broker as follows: [¶] (1) If Broker, Seller, cooperating broker, or any other person procures a buyer(s) who offers to purchase the Property on the above price and terms, or on any price and terms acceptable to seller during the listing period, or any extension."

Paragraph 4.D. of the Listing Agreement addresses the subject of cooperating brokers. It states that sellers had been advised that Bolin had a policy of cooperating with other brokers and sets forth "the amount of compensation offered to, other brokers." Subparagraph 4.D. (1) states: "Broker is authorized to cooperate with and compensate brokers participating through the multiple listing service(s) ('MLS'): (i) by offering MLS brokers: either [here a box is checked] 2½ [filled in a blank] percent of the purchase price . . . ."

*B. Analysis*

Tardif argues that she adequately alleged a cause of action for breach of contract as a third party beneficiary of the Listing Agreement, relying on allegations that she procured the buyers within the listing period. She contends that an agreement to sell the property was consummated between the buyers and seller "or their alter egos" during the listing period. She apparently argues that the signing of the agreement for sale of the property to Island Shores is a sufficient allegation that the buyer's price and terms were

8

acceptable to the owners as required under paragraph 4 of the Listing Agreement. Based on this reasoning, she contends she was entitled to a 2½ percent commission under the Listing Agreement. Tardif argues: "However, the sale occurred outside the auspices of the Listing Agreement . . . and did not involve the payment of commission to the cooperating seller broker [Tardif] . . . as required under the contract . . . thereby giving rise to a cause of action for a third-party breach of contract."

As a separate basis for her cause of action for breach of contract, Tardif relies on paragraph 4.A.(2) of the Listing Agreement. As alleged, that paragraph provides for payment of a commission after cancellation of the Listing Agreement if the owners entered into a contract of sale with buyers who were physically shown the property during the listing period or had submitted a signed written offer to acquire the property.[4] Tardif notes that she did not allege that the Listing Agreement had been cancelled, and that cancellation would be a question of fact beyond the scope of a demurrer. But she alleged that she showed the property to Brian and Snizhana Willis, submitted a signed offer for them, and that the property was sold to their "related entity," Island Shore Services, which she describes as the buyers' "wholly-held LLC and alter ego." The complaint alleged that the ultimate buyer, Island Shore Services, LLC is "a corporation owned and/or controlled by 'BUYERS' and which was the alter ego of 'BUYERS' . . . ."

---

[4] Subparagraph 4.A.(2) provides an alternative commission provision to address sales made to a buyer identified during the listing period, but who does not buy until after the end of the listing: "If Seller, within ____ calendar days (a) after the end of the Listing Period or any extension, or (b) after any cancellation of this Agreement, unless otherwise agreed, enters into a contract to sell, convey, lease or otherwise transfer the Property to anyone ('Prospective Buyer') or that person's related entity; (i) who physically entered and was shown the Property during the Listing Period or any extension by Broker or *a cooperating broker*; or (ii) for whom Broker or *any cooperating broker* submitted to Seller a signed, written offer to acquire, . . . the Property. Seller, however, shall have no obligation to Broker under paragraph 4.A.(2) unless, not later than 3 calendar days after the end of the Listing Period or any extension or cancellation, Broker has given Seller a written notice of the names of such Prospective Buyers." (Italics added.)

The third basis for the breach of contract cause of action under the Listing Agreement is the third subparagraph of paragraph 4.A. which provides for payment of 2½ percent to the seller broker if the property was withdrawn from sale, conveyed, or transferred by seller during the listing period or any extension without "Broker's prior written consent". The Listing Agreement identifies Bolin, not Tardif, as the "Broker." Tardif argues that this provision applies because buyers withdrew their counteroffer, and then purchased the property the same day by using the Island Shores entity.

Tardif argues the trial court erred in relying on *Colbaugh v. Hartline* (1994) 29 Cal.App.4th 1516 (*Colbaugh*) in sustaining the demurrers to the cause of action for breach of contract on a third party beneficiary theory. She contends that *Colbaugh* is distinguishable. In that case, a ranch was listed for sale with a broker using a standard form "Exclusive Authorization to Sell" which authorized the broker to cooperate with subagents and provided for a 6 percent commission to the listing broker. At sale, the 6 percent commission was paid by sellers, 3 percent to the listing broker, and 3 percent to Regal Realty and one of its agents. Before the escrow closed, plaintiffs (Roger Colbaugh, a broker, and Rodney Niebuhr, a salesman who was associated with him) demanded the 3 percent cooperating broker's commission on the ground that they, rather than Regal Realty, were the procuring cause of the sale. Plaintiffs sued for the commission and settled with the buyers of the property and the real estate agents who received the cooperating broker's commission. They went to trial against the sellers, but the trial court granted nonsuit in favor of the sellers.

The Court of Appeal found no evidence of a written cooperation agreement between the listing broker and the cooperating brokers. (*Colbaugh*, *supra*, 29 Cal.App.4th at pp. 1523–1524.) It also held that any action was barred for failure to comply with the statute of frauds for real estate commissions. (Civ. Code, § 1624, subd. (5).) It noted that there was no provision in the Listing Agreement authorizing the listing agent to divide any commission with subagents. In addition, since the sellers had complied with the only commission term by paying 6 percent to the listing agent, there

10

was no evidence of a breach of the Listing Agreement. (*Id.* at pp. 1524–1525.) Tardif argues that *Colbaugh* is distinguishable because here the Listing Agreement expressly provided for payment of a 2½ percent commission to the cooperating broker. Tardif alleged that sellers were fully aware of this provision in that they signed the Listing Agreement.

We agree with Tardif that *Colbaugh*, *supra*, 29 Cal.App.4th 1516 is distinguishable on this basis. Here, unlike *Colbaugh*, there was a written agreement, signed by one of the sellers, to split the commission between the listing broker and the cooperating broker. In *Colbaugh* there was no written agreement between the listing broker and cooperating broker, nor was there evidence that the listing broker agreed to employ plaintiff as a subagent or to pay him a commission if he procured the sale of the property. The plaintiffs were among a number of brokers who were given materials soliciting a bid on the property. (*Id.* at p. 1523.)

*Colbaugh* also is distinguishable because Tardif was a participant in the MLS, while the plaintiffs in *Colbaugh* were not. (*Colbaugh*, *supra*, 29 Cal.App.4th at p. 1523, fn. 1.) In a footnote, the *Colbaugh* court acknowledged the impact of a listing with the Multiple Listing Service: "As noted above, the brokers did not make contact through the local Multiple Listing Service. 'When the listing is filed with the Multiple Listing Service there is an express offer to pay compensation to a member of the Service who procures a buyer; the amount of the compensation is stated as a specific sum or a percentage of the sales price of the property.' (1 Miller & Starr, [Cal. Real Estate (2d ed. 1989)] § 2:30, p. 621.)" (*Id.* at p. 1523, fn. 3.) The court concluded that the availability of a cause of action by a cooperating broker against the seller depends on "'whether the owner was aware of, or expressly authorized, the cooperation agreement between the listing broker and the cooperating broker, whether the seller accepted the buyer's offer by executing a contract of sale, and whether the sale to the buyer was consummated.' (1 Miller & Starr, *op. cit. supra*, § 2:30, pp. 623–624.)" (*Id.* at pp. 1523–1524.) Tardif alleged that sellers accepted the buyers' offer and that the sale was consummated, albeit

11

through the use of the Island Shores entity which she alleged was the alter ego of the buyers.

Where a contract is expressly made for the benefit of a person who is not a party to a contract, that third party may sue to enforce his or her rights. (*Mercury Casualty Co. v. Maloney* (2003) 113 Cal.App.4th 799, 802, citing Civ. Code, § 1559.) A putative third party beneficiary must demonstrate that the claimed benefit is one the contracting parties intended to confer. (*Rodriguez v. Oto* (2013) 212 Cal.App.4th 1020, 1028; see also *Spinks v. Equity Residential Briarwood Apartments* (2009) 171 Cal.App.4th 1004, 1022.) "The rights of a third party beneficiary thus depend upon the intent of the contracting parties. (*Hess v. Ford Motor Co.* (2002) 27 Cal.4th 516, 524 (*Hess*).) 'Ascertaining this intent is a question of ordinary contract interpretation.' (*Ibid.*) It follows that if the requisite intent appears unambiguously from the face of the contract, the third party makes a prima facie showing of entitlement merely by proving the contract." (*Rodriguez v. Oto*, *supra*, 212 Cal.App.4th at p. 1028 ["In a case of this kind, the contract either grants an *intentional* benefit to the person asserting rights under it, or it affords him no benefit at all."].)

The decision in *Steve Schmidt & Co. v. Berry* (1986) 183 Cal.App.3d 1299 (*Schmidt*) is instructive. In that case, a property sale fell through when the buyer refused to agree with terms of a counteroffer by the seller. The Listing Agreement provided that the seller authorized his agent to cooperate with other brokers and to divide any commission due under the agreement with them. (*Id*. at p. 1311.) Unlike our case, the intent to allow division of the commission was further memorialized in a written letter agreement between the listing broker and the cooperating broker. That agreement provided that the 6 percent commission would be divided between the brokers if the cooperating broker procured a ready, willing, and able buyer. (*Ibid.*) Although *Schmidt* involved review of a summary judgment, no extrinsic evidence was presented on the issue of the division of the commission so it was treated as a question of law based on interpretation of the agreement. (*Schmidt*, *supra*, 183 Cal.App.3d at p. 1313.) The court

12

found that the seller was bound by the listing broker's promise to share the commission with the cooperating broker and that the seller had made an implied promise to the cooperating broker to pay him. (*Id*. at p. 1312.) The court also found that the cooperating broker had enforceable rights against the seller "as a member of a class which was intended to be directly benefited" by the seller's promise to divide the commission between the listing and cooperating brokers. (*Id*. at p. 1313.)

Sellers argue that Tardif cannot assert third party beneficiary status because the Listing Agreement does not identify specific parties or the class of the parties intended to benefit by the agreement. We disagree. The *Schmidt* court reasoned: "It is not necessary that the contract identify the third party by name as long as such third party can show that he is one of a class of persons for whose benefit it was made. [Citations.]" (*Schmidt*, *supra*, 183 Cal.App.3d at p. 1313.) It concluded that section 10(c) of the Listing Agreement expressed this intent: "(c) Owner hereby authorizes Agent to cooperate with other brokers, salesmen and subagents, and to divide with them any commission or other compensation due under this Agreement." (*Id*. at p. 1304.)

The language of the Listing Agreement here is similar to the language relied upon by the *Schmidt* court. Paragraph 4.D. states: "Seller has been advised of Broker's [Bolin] policy regarding cooperation with, and the amount of compensation offered to, other brokers. [¶] (1) Broker is authorized to cooperate with and compensate brokers participating through the multiple listing service(s) ('MLS'): (i) by offering MLS brokers: either [here a box is checked] 2½ percent of the purchase price . . . as per Broker's policy." As did the plaintiff in *Schmidt*, *supra*, 183 Cal.App.3d 1299, Tardif adequately alleged she was a third party beneficiary of the Listing Agreement and that this agreement to pay her commission was breached when the property was sold to an entity that is the alter ego of the buyers she procured. Under the language of the Listing Agreement, sellers promised to pay the cooperating broker's commission. In light of this conclusion, we need not address sellers' arguments premised on the lack of an express written agreement to pay a commission to a cooperating broker, such as Tardif.

13

Sellers attempt to distinguish *Schmidt* by arguing that no contract was created for the sale of the Cherokee property because of the counteroffer and the buyers' withdrawal of their offer. But as we have discussed, Tardif had third party beneficiary rights arising from the Listing Agreement itself.

Sellers next argue that Tardif cannot claim a right to a commission as third party beneficiary because the sale was never consummated, a condition precedent to the right to a commission. Paragraph 4.A.(1) of the Listing Agreement provides that a commission was to be paid (1 percent to listing broker, 2½ percent to seller broker) if a cooperating broker procures a buyer(s) "who offers to purchase the Property on the above price and terms, *or on any price and terms acceptable to Seller during the Listing Period* . . . ." (Italics added.) The documents attached to the second amended complaint establish there was no offer for the listing purchase price of $9,625,000. But, Tardif alleged that before the Listing Agreement expired on May 8, 2008, the Cherokee property was sold to an alter ego of buyers. "Whether a party is liable under an alter ego theory is a question of fact. [Citation.]" (*Leek v. Cooper* (2011) 194 Cal.App.4th 399, 418.) Under the principles governing review of a ruling sustaining a demurrer, we must treat the demurrer as admitting all material facts properly pleaded. (*C.A. v. William S. Hart Union High School Dist.*, *supra*, 53 Cal.4th at p. 866.) Therefore, at the pleading stage, we must accept as true the allegation that Island Shores, which purchased the Cherokee property from sellers was the alter ego of the Willises who were procured by Tardif.

Sellers argue that Tardif cannot bring a breach of contract cause of action against them as third party beneficiaries of the Listing Agreement because they are not identified as sellers on that document. As we have noted, the line for seller is filled in with the address of the property rather than with the names of the owner. The second amended complaint does not contain an allegation addressing this issue. In her reply brief, Tardif argues that sellers raise a factual issue regarding the identity of the seller, which must be resolved in favor of the allegations of the complaint on demurrer. In their brief, sellers assert that "ZATIKYAN presented a written counteroffer to the WILLISES in the amount

14

of $9,220,000.00 which was not accepted." This statement is supported by a reference to the largely illegible counteroffer which was made an exhibit to the second amended complaint and the succeeding versions. This is an admission that at least Zatikyan was in fact the seller of the Cherokee property. In addition, both the purchase offer prepared by Tardif on behalf of the buyers dated April 29, 2008 and the counteroffer prepared by Tardif for buyers identify Zatikyan and Grigoryan as sellers. Both documents are exhibits to the second amended complaint. Any ambiguity regarding the identity of the seller on the Listing Agreement may be resolved by amendment of the cause of action for breach of contract on the third party beneficiary theory and by attaching a legible copy of the counteroffer dated April 30, 2008.

Sellers also argue that Tardif was required to allege that a commission was paid to the listing broker which was to be shared with Tardif. But the fact that no commission was paid to the listing broker does not exclude a claim by Tardif for her commission under the express terms of the Listing Agreement we have discussed.

We conclude that Tardif adequately alleged a cause of action for breach of contract based on the Listing Agreement against the sellers and reverse the trial court's ruling sustaining demurrers to that cause of action without leave to amend.


### III

At oral argument, counsel for Tardif clarified her theory against Bolin. He explained that it is based on breach of the listing of the property with the Multiple Listing Service, a document attached as an exhibit to the third amended complaint. He explained that Tardif is not claiming a right to collect her commission from Bolin under the terms of the Listing Agreement. Based on that representation, we do not discuss the arguments of the parties regarding any possible liability of Bolin to Tardif under the Listing Agreement or any document in this matter other than the listing itself.

Bolin's argument under the listing is based on the following provision at the bottom of the form: "CS0: 2.5%". He contends that under the rules and regulations of

the Multiple Listing Service, this notation means that cooperating brokers are promised a 2.5 percent commission for procuring ready and willing buyers. This language, he contends, constituted a unilateral offer to Tardif on which she relied.

Tardif's reliance on the listing document itself fails because it does not identify Bolin as the party who promised to pay a commission to a cooperating broker. "In a unilateral contract, there is only one promisor, who is under an enforceable legal duty. (1 Corbin on Contracts (1993) § 1.23, p. 87.)" (*Asmus v. Pacific Bell* (2000) 23 Cal.4th 1, 10.) The factual recitations of the third amended complaint alleged that after sellers and Bolin executed the Listing Agreement, "[t]he property was thereafter listed in the MLS by Defendant, BOLIN on or about January 8, 2008 for the asking price of $9,495,000.00 with 2 ½ % *to be paid by 'Sellers'* to any licensed real estate agent who was a member of the MLS and who procured a buyer for the property." (Italics added.) The cause of action for breach of contract, which incorporates this allegation, inconsistently alleges that the MLS listing was a unilateral offer made by each of the defendants.

We conclude that the terms of the listing itself do not establish a unilateral offer *by Bolin*, as opposed to sellers, to pay a 2.5 percent commission to cooperating brokers. Tardif failed to allege a contract theory against Bolin and we affirm the court's rulings on that basis as to that theory only.

Bolin also argues that the exclusive remedy for resolving disputes between brokers concerning a MLS listing is arbitration under the rules of the MLS, which are quoted extensively in the fourth amended complaint. Bolin did not invoke the right to arbitrate any claim brought against her by Tardif in her demurrer to the second amended complaint. She does not demonstrate that she unsuccessfully sought arbitration of those claims. The right to arbitrate was waived. (*See Lewis v. Fletcher Jones Motor Cars, Inc.* (2012) 205 Cal.App.4th 436, 448–449 [piecemeal litigation of issues, including demurrers, through pretrial procedures justifies finding of waiver].)

16

We find no error in the trial court's ruling sustaining the demurrers to Tardif's cause of action for breach of contract as to Bolin.

IV

The fourth amended complaint alleged a cause of action for intentional interference with prospective economic advantage. Tardif alleged that several days after the Willises rejected the sellers' counteroffer, Bolin contacted them without informing Tardif. She alleged that Bolin told the Willises that the sellers were very motivated to sell the Cherokee property and that they should meet to discuss the sale. Tardif alleged that Bolin told the Willises not to contact her, and that Bolin and the sellers would "'take care' of [Tardif] by paying her for bringing them to the property, if they agreed to purchase the Cherokee Lane property for $9 million." The Willises agreed, and the sale was consummated for that amount. Bolin received her 1 percent commission of $90,000 and Tardif was paid nothing. Tardif alleged that the defendants intentionally concealed the sale from her by designating the property as withdrawn from the MLS rather than as sold. She alleged that the defendants acted with the knowledge and intent to deprive her of her 2½ percent commission. As a result, she alleged she did not discover the sale had been made to the Willises through the Island Shores entity until she received an e-mail from the Willises on or about August 20, 2009. These allegations are supported by footnotes quoting portions of the MLS Rules and Regulations.

Defendants argue this cause of action is barred by the two-year limitations period of Code of Civil Procedure section 339, subdivision (1). (*Augusta v. United Service Automobile Assn.* (1993) 13 Cal.App.4th 4, 10; see also *Knoell v. Petrovich* (1999) 76 Cal.App.4th 164, 168.) Tardif contends that sellers raise this issue for the first time on appeal. That is incorrect. The bar of the statute of limitations was a ground for their demurrer to the fourth amended complaint. In the fourth amended complaint, Tardif alleged that she learned of the basis for the intentional interference claim on August 20, 2009. The fourth amended complaint was filed October 24, 2011.

In her reply brief, Tardif argues that the claim is not barred because it arises from the same facts and circumstances alleged in the original complaint, which was filed November 17, 2009. The original complaint alleged a cause of action for interference with prospective economic advantage. The sellers answered this complaint. But it was superseded by a first amended complaint, filed with leave of the trial court, which included a cause of action for intentional interference. The sellers demurred. The trial court sustained the demurrer to the cause of action in the first amended complaint on the ground that Tardif had not adequately pled various elements of the tort. It granted 20 days leave to amend. Tardif did not allege a cause of action for intentional interference in the second amended complaint. But after the trial court sustained defendants' demurrers to all causes of action alleged in the third amended complaint, it granted Tardif's request for leave to amend to allege a cause of action for interference with prospective economic advantage.

We conclude that the allegation of the fourth amended complaint relates back to the original complaint which was filed in 2009, and was timely. "'[T]he relation-back doctrine deems a later-filed pleading to have been filed at the time of an earlier complaint which met the applicable limitations period, thus avoiding the bar. In order for the relation-back doctrine to apply, "the amended complaint must (1) rest on the *same general set of facts*, (2) involve the *same injury*, and (3) refer to the *same instrumentality*, as the original one."' [Citation.]" (*Bjorndal v. Superior Court* (2012) 211 Cal.App.4th 1100, 1113.) The interference cause of action of the fourth amended complaint rests on the same set of facts regarding the listing and sale of the Cherokee property, is based on the same injury (loss of the 2½ percent commission), and refers to the same documents alleged in the original complaint. In addition, although Tardif failed to include the interference cause of action in her second amended complaint after having been given leave to amend it, the trial court acted within its discretion in concluding that a possible cause of action could be alleged in the fourth amended complaint. We turn to the merits of the pleading.

18

The elements of a cause of action for intentional interference with prospective economic advantage are "'"(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." [Citations.]' [Citation.]" (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1153.) In addition, the plaintiff must "plead intentional *wrongful* acts on the part of the defendant designed to disrupt the relationship." (*Id*. at p. 1154.) "[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard. [Citations.]" (*Id*. at p. 1159, fn. omitted.)

Tardif alleged that Section 8.1 of the MLS Rules and Regulations requires the listing broker to obtain authorization from the sellers to comply with various provisions of the MLS rules before submitting a listing to the MLS. These include: "c). abide by the rules of the MLS; d). provide timely notice of status changes of the listing to the MLS; e). provide sales information, including selling price, to the MLS upon sale of the property for publication and dissemination to those authorized by the MLS; and f). publish sales information after the final closing of a sales transaction in accordance with these MLS Rules." She further alleged that the actions of the defendants in removing the Cherokee property from the MLS with a "'*Withdrawn*' designation rather than a '*Sold*' designation, concurrently with close of escrow was a violation of MLS Rules and Regulations Section 10.2, which states: "'Listings with accepted offers shall be reported to the MLS or input into the MLS database as 'pending' or 'back-up' within 2 business days of the acceptance . . . Upon final closing, the listing broker shall report or input the listing in the MLS as 'sold' within 2 business days of the final closing . . . .'" She alleged that listing the property as sold within the required time frame would have alerted her to the fact the property had actually sold. She alleged that this violation of the

19

MLS rules was "intentionally designed to deny Plaintiff her 2½ percent commission on the sale of the Cherokee Lane Property."

Under the rules governing review of a ruling on a demurrer, we accept these allegations regarding the rules of the MLS as true. Tardif has adequately alleged the elements of the interference cause of action, including that defendants' conduct was independently wrongful because it was proscribed by the quoted rules and regulations of the MLS.

## DISPOSITION

The judgment of dismissal is reversed as to Tardif's causes of action for breach of contract on a third party beneficiary theory as to sellers. The judgment of dismissal is affirmed as to the contract theory against Bolin. We reverse the judgment of dismissal on the cause of action for intentional interference with prospective economic advantage as to sellers and Bolin. Tardif is to have her costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EPSTEIN, P. J.

We concur:

WILLHITE, J.

MANELLA, J.

20